Marion Frank CRAWFORD, Appellant,

v.

V. Lee BOUNDS, Warden of Central Prison (Successor to K. B. Bailey), Appellee.

No. 10981.

United States Court of Appeals Fourth Circuit.

Argued Oct. 3, 1967.

Decided April 11, 1968.

———◆———

M. C. Burt, Jr., Durham, N. C. (McKissick & Burt, Durham, N. C., on brief) for appellant.

William Van Alstyne, Durham, N. C., as amicus curiae.

Daniel H. Pollitt, Chapel Hill, N. C. (Charles F. Lambeth, Jr., Thomasville, N. C., on brief) for the North Carolina Civil Liberties Union, as amicus curiae.

Ralph A. White, Jr., Staff Atty., Office of the Atty. Gen. of North Carolina (Thomas Wade Bruton, Atty. Gen. of North Carolina, and Theodore C. Brown, Jr., Staff Atty., Office of the Atty. Gen., of North Carolina, on brief) for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN and BUTZNER, Circuit Judges.*

WINTER, Circuit Judge:

Petitioner, a thirty-year-old male Negro, was convicted of first degree murder of an eight-year-old female Negro child, occurring in the course of the commission of rape, allegedly perpetrated by him November 18, 1962.[1] N.C. Gen.Stat. § 14–17: Petitioner was found guilty and, because the jury's verdict contained no recommendation for mercy, petitioner was sentenced to death. On appeal, the judgment entered on petitioner's conviction was affirmed. State v.

---

* The case was argued initially, on January 12, 1967, before a panel of the Court consisting of Bell and Winter, Circuit Judges, and Russell, District Judge. Because Judge Bell died before decision in the case and because of the importance of the issues, the Court, on its own motion, ordered reargument en banc.

1. Petitioner was also indicted for rape, itself a capital offense under the laws of North Carolina. N.C. Gen.Stat. § 14–21. He has never been tried on this indictment.

Crawford, 260 N.C. 548, 133 S.E.2d 232 (1963).

About an hour prior to the time that capital punishment was to be carried out, petitioner sought a writ of habeas corpus from the district court. He obtained a stay of execution, but he was remitted to available state remedies, not then exhausted. The district court retained jurisdiction until state exhaustion had occurred. Petitioner sought post-conviction relief and was afforded a plenary hearing, where he was represented by court-appointed counsel. N.C.Gen. Stat. § 15-217. Relief was denied him and the issuance of a writ of certiorari was denied by the Supreme Court of North Carolina. He then renewed his application for a writ of habeas corpus in the district court, which, after considering it, the record extract and briefs of the appeal in his original trial, and the transcript of the state post-conviction proceeding (excluding the exhibits admitted at that hearing), summarily denied him relief.[2]

Before the district judge, petitioner advanced numerous contentions why the judgment entered on his conviction was invalid. He claimed, generally, that he was denied due process of law, in that he was never adequately informed of the charges against him and was convicted of a crime with which he was not charged, and that he was denied his right to indictment by grand jury because the prosecutor was permitted to amend the indictment to include matters not presented to the grand jury; that he was denied his right to a trial by an impartial jury because the prosecutor was permitted to challenge for cause prospective jurors who expressed sentiments against capital punishment; that he was denied due process because the prosecutor refused to accept a plea of guilty with sentence of life imprison-

ment; that he was denied due process because the prosecutor announced, prior to trial, that he would seek the death penalty, the prosecutor introduced irrelevant evidence at the trial for its inflammatory effect on the jury, told the jury of petitioner's prior criminal record, and pleaded with the jury for the death penalty; that he was denied a fair trial because inflammatory evidence, including pictures of the deceased's body and her private parts, was exhibited to the jury; that he was denied effective assistance of counsel because a lawyer was not appointed to represent him before the preliminary hearing and, when his court-appointed counsel was appointed, he represented petitioner incompetently; and that the North Carolina statute relating to the death penalty is unconstitutional on its face and in its application to members of the Negro race.

Most of these claims of invalidity were pressed at the state post-conviction hearing and evidence was offered in support of many of them. Absent any suggestion of waiver or deliberate bypass, and there is none, petitioner has exhausted his available state remedies in regard to the contentions made before the district court. Stem v. Turner, 370 F.2d 895 (4 Cir. 1966); McNeil v. State of North Carolina, 368 F.2d 313 (4 Cir. 1966). We conclude that petitioner is entitled to a writ of habeas corpus because his constitutional rights were violated by the manner in which the jury to determine his criminal responsibility was selected, and particularly because the prosecutor was allowed successfully to challenge prospective jurors for cause who expressed sentiments against capital punishment and thus to disqualify a substantial segment of the panel, without the additional determination being made that their objections to capital punishment would preclude them from

2. Before petitioner's application was considered on its merits, an amended application was dismissed for failure to state a claim on which relief could be granted. We reversed, Crawford v. Bailey, 360 F. 2d 596 (4 Cir. 1966), with directions to allow the filing of a supplemental petition incorporating previous allegations by reference. Such a supplemental petition was filed on remand. It was the supplemental petition, incorporating all previous allegations, that was dismissed.

rendering a fair verdict on the issue of guilt.[2a] We confine our consideration, therefore, to that issue.[3]

It is undisputed that members of the panel, from which the jury that convicted petitioner was chosen, were interrogated as to whether they had any sentiment or reservation against capital punishment; and any who expressed any such sentiment or reservation were, at the request of the prosecutor, immediately excused for cause without further inquiry. Thirty-four of seventy-five prospective jurors were disqualifed on this broad ground. None of these thirty-four was asked whether his scruples against capital punishment would interfere in any way in the determination of petitioner's guilt or innocence. Thus, 45.33% of the cross-sectional panel was eliminated from service on the petit jury because of a conscientious scruple toward capital punishment without inquiry as to what effect, if any, their scruples would have on their ability to decide the issue of petitioner's guilt or innocence.[4] Moreover, four veniremen were peremptorily challenged by the prosecution after preliminary questioning established that they were less than firm believers in capital punishment. Including these four, thirty-eight out of seventy-five veniremen (50.66% of the total) were thus excluded from petit jury service for these reasons.

In sharp contrast to the 45.33% of excluded jurors, a juror who admitted that he had "more or less, a fixed opinion" about the case as a result of reading about it in the newspaper was permitted to serve after the trial judge questioned him and elicited the further answers that the juror could "erase" the opinion from his mind, and that he could "disabuse" his mind of the opinion, and decide the case solely on the evidence adduced in court, applying thereto the court's instructions, so as to give the state and petitioner a fair trial. The challenge of defense counsel for cause was denied.

Thirty-one jurors were accepted by the prosecutor. Only thirteen were actually empaneled, but each of the thirty-one professed a belief in capital punishment. Indeed, one of the thirteen stated that he believed "in the doctrine of an eye for an eye," and that he believed it would be his *duty* to sentence a defendant found guilty of murder to

---

**2a.** We take note that on January 15, 1968, the Supreme Court granted certiorari in Witherspoon v. Illinois, 389 U.S. 1035, 88 S.Ct. 793, 19 L.Ed.2d 822 (January 16, 1968), and Bumper v. North Carolina, 389 U.S. 1034, 19 L.Ed.2d 823 (January 16, 1968), 36 L.W. 3298–3299 (January 23, 1968), in which substantially the same question is presented. We, nevertheless, deem it appropriate to express our views.

**3.** We do not suggest that petitioner's other contentions either possess or lack merit. It suffices that we see no constitutional bar to retrial. Since petitioner's original trial counsel was granted leave to withdraw from representation of petitioner, even prior to the Federal Court proceedings, our decision renders moot the claim of denial of effective representation of counsel. We assume, on retrial, that with alert and competent counsel, petitioner will have full opportunity to litigate vigorously (1) any attempt of the state to use the photographs complained of here under State v. Foust, 258 N.C. 453, 128 S.E.2d 889 (1963), (2) any at-

tempt of the state to repeat the argument complained of here under Hall v. United States, 150 U.S. 76, 14 S.Ct. 22, 37 L.Ed. 1003 (1893), and Wagner v. United States, 263 F.2d 877 (5 Cir. 1959), (3) the sufficiency of the indictment and notice to petitioner under McClure v. State, 267 N.C. 212, 148 S.E.2d 15 (1966), and (4) any other procedural or substantive issues that counsel deem advisable to raise, all under the authorities cited and any others pertinent to those issues.

**4.** The percentage is startlingly close to the results of a 1966 Gallup Poll which showed 47% of those interviewed were opposed to capital punishment. The results of the poll were adopted and reported in Task Force Report: The Courts, The President's Commission on Law Enforcement and Administration of Justice (1967) 27. The results of the poll were summarized in the main report of the Commission, The Challenge of Crime in a Free Society (1967) 143.

capital punishment. Thus, while no person known to entertain even an unexamined scruple regarding the death penalty was permitted to qualify, a juror known to regard a sentence of death as his "duty" was permitted to serve.

In permitting the veniremen in petitioner's case to be examined on *voir dire* as to their reservations or sentiments against capital punishment and excusing them on challenge for cause if they evidenced conscientious scruples against imposition of capital punishment, the original trial judge proceeded in accordance with established North Carolina practice, approved over sixty-three years before. State v. Vick, 132 N.C. 995, 43 S.E. 626 (1903); State v. Vann, 162 N.C. 534, 77 S.E. 295 (1913); State v. Arnold, 258 N.C. 563, 129 S.E.2d 229 (1963), rev'd on other grounds, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964). See also, State v. Manning, 251 N.C. 1, 110 S.E. 2d 474 (1959) (concurring opinion); State v. Childs, 269 N.C. 307, 152 S.E.2d 453 (1961). It is significant that the *Arnold* and *Childs* cases arose and were decided after a 1949 amendment to the criminal statutes of North Carolina which permitted, for the first time, a jury in a prosecution for first degree murder upon a determination of guilt to exercise a choice between the imposition of death or life imprisonment. Theretofore death was the exclusive and inevitable judgment to be entered on a jury's verdict of guilt of first degree murder.

The text of the 1949 amendment is set forth in the margin and consists of the emphasized portion of N.C.Gen.Stat. §

14–17.[5] The function of the jury under the amendment has been considered in many decisions. In State v. McMillan, 233 N.C. 630, 65 S.E.2d 212 (1951), it was held that an instruction to the jury that the statute gave them the right to recommend life imprisonment "if they feel that under the facts and circumstances of the crime alleged to have been committed by the defendant, they are warranted and justified in making that recommendation" and that if they did not feel "under the facts and circumstances" that such a recommendation was warranted, they should act accordingly, vitiated an otherwise valid conviction in which a verdict, without recommendation was returned. The vice in the instruction was, the Court said, that it placed unauthorized restrictions upon the discretion vested in the jury:

"The language of this amendment stands in bold relief. It is plain and free from ambiguity and expresses a single, definite and sensible meaning, —a meaning which under the settled law of this State is conclusively presumed to be the one intended by the Legislature. * * *

"It is patent that the sole purpose of the act is to give to the jury in all cases where a verdict of guilty of murder in the first degree shall have been reached, the right to recommend that the punishment for the crime shall be imprisonment for life in the State's prison. * * * *No conditions are attached to, and no qualifications or limitations are imposed upon, the right of the jury to so recommend.*

5. "§ 14–17. Murder in the first and second degree defined; punishment.—A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death: *Provided, if at the time of rendering its verdict in open court, the jury shall so recommend, the punish-*

*ment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury.* All other kinds of murder shall be deemed murder in the second degree, and shall be punished with imprisonment of not less than two nor more than thirty years in the State's prison." (emphasis supplied)

Similar language was added to N.C. Gen.Stat. §§ 14–21, 14–52 and 14–58 at the same time. These statutes provide optional penalties of death or life imprisonment for rape, first degree burglary and arson, respectively.

*It is an unbridled discretionary right. And it is incumbent upon the court to so instruct the jury. In this, the defendant has a substantive right. Therefore, any instruction, charge or suggestion as to the causes for which the jury could or ought to recommend is error sufficiently to set aside a verdict where no recommendation is made."* (emphasis supplied) *Id.,* 65 S.E.2d, at p. 213.

The consistency with which North Carolina has adhered to the rule of "unbridled discretion" was fully documented in the concurring opinion of Justice Denny in State v. Pugh, 250 N.C. 278, 108 S.E.2d 649 (1959), which discussed the twelve cases which arose between the date of the statute and 1959. Review of all of them is unnecessary. It suffices to say that in State v. Simmons, 234 N.C. 290, 66 S.E.2d 897 (1951), it was held erroneous to characterize to the jury that the statute imposed a "duty" to consider recommending life imprisonment; in State v. Dockery, 238 N.C. 222, 77 S.E.2d 664 (1953), it was held reversible error for the prosecutor to argue against life imprisonment because of the possibility of parole; in State v. Denny, 249 N.C. 113, 105 S.E.2d 446 (1958), it was held error for the judge to tell the jury that it could not consider the death penalty, where the prosecutor had stated that he was not seeking the death penalty; and in the *Pugh* case it was held error for the trial judge to state the ultimate contention of the prosecutor that mercy should not be recommended. The later decided cases of State v. Manning, supra, and State v. Christopher, 258 N.C.

249, 128 S.E.2d 667 (1962), are fully in accord.

Petitioner argues that the practice of obtaining a so-called "death-qualified" jury, by the allowance of successful challenge for cause of all persons with conscientious scruples against capital punishment, interferes with the "unbridled discretion" of the jury. This is a question of state law which we consider settled adversely to petitioner's contention by State v. Arnold, supra, and State v. Childs, supra.[6] Petitioner also argues that the practice of obtaining "death-qualified" juries offends current concepts of due process and equal protection of the laws.

At the outset, we think that petitioner would be entitled to the writ because of the inherently unfair manner in which the jury was selected in this case. Our recitation of the proceedings exposes two salient facts: (1) a venireman who thought it was his "duty" to impose capital punishment in the event of conviction was permitted to serve, while those whose dictates of conscience would presumably feel a converse duty were summarily excluded from service, and (2) a venireman who had reached an opinion about the case, prior to trial, was interrogated by the trial judge until his qualification to serve was established, while those who admitted to scruples against capital punishment were dismissed without further interrogation. We cannot escape the conclusion that, as a result of insufficient interrogation and a double standard of inquiry, the petit jury selected was at the outset more likely to impose capital punishment in the event of conviction than not. The unexamined

---

6. The North Carolina Supreme Court has not addressed itself specifically to the argument that the scope of "'unbridled discretion" is so broad and the jury so clearly entitled to exercise it for reasons *dehors* the record, that as a matter of statutory construction a juror should be free to recommend life imprisonment because of a conscientious belief against capital punishment; but in its latest decision, State v. Childs, 269 N.C. 307, 152 S.E.2d 453, 461 (1967), has impliedly rejected it, saying: "It is a general rule that the State in the trial of crimes punishable by death has the right to an impartial jury, and in order to secure it, has the right to challenge for cause any prospective juror who is shown to entertain beliefs regarding capital punishment which would be calculated to prevent him from joining in any verdict carrying the death penalty."

"duty" of one member of the panel may have been so strong that no verdict of guilt, except one imposing capital punishment, could have been returned. Certainly, the concept of "duty," standing alone, carries that inescapable inference. Petitioner was, therefore, denied due process of law in violation of the Fourteenth Amendment.

 That the Fourteenth Amendment guarantees "to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors" is established by Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Prejudice, bias or other basic form of predisposition on the part of the trier of the fact results in a denial of due process. Re Murchison, 349 U.S. 133, 75 S. Ct. 623, 99 L.Ed. 942 (1955); Re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); Tumey v. State of Ohio, 273 U. S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879). Where North Carolina has chosen to make the degree of punishment a jury question in the event of conviction, as in the instant case, the guaranty that a juror be "impartial, 'indifferent,'" is as applicable to the issue of punishment as to the issue of guilt. To permit a juror whose mind is foreclosed on one side of that issue to serve, while eliminating those who think to the contrary, and to exert special effort to qualify one whose mind may be foreclosed on the issue of guilt while freely excusing those who indicate a predisposition as to punishment, were not the ways to achieve the constitutional objective. Denial of equal treatment in the manner of selection inevitably resulted in denial of due process.

Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919), 251 U. S. 380, 40 S.Ct. 176, 64 L.Ed. 317 (1920), is a case directly in point with what was done in regard to the juror who felt himself under a "duty" to impose capital punishment in the event of conviction. There it was said that a challenge should be sustained to a juror whose testimony "made it reasonably certain that, in the event of conviction for murder in the first degree, he would render no other verdict than one which required capital punishment." *Id.,* 251 U.S., p. 381, 40 S.Ct. p. 381. See also Reynolds v. United States, supra. It is true that in *Stroud* the court's failure to sustain the challenge was held not reversible error because the accused had been afforded more peremptory challenges than he was entitled to by law and the accused had challenged peremptorily the juror in question, so that, in the view of the Court, it could not be said that the accused's right to challenge peremptorily was abridged. Here, petitioner was afforded only the number of peremptory challenges permitted him by law, and he consumed them all in the selection of the jury. Unlike *Stroud,* there is no ground to say that petitioner was not prejudiced.

While our decision may be rested on the narrow ground that, by reason of the manner of selection of the jury, petitioner was denied due process of law, this record reflects a more significant denial of constitutional right and one which is not correctible on retrial under North Carolina law and practice as they now prevail. Since we order petitioner's retrial, it is appropriate to rest our decision on the systematic exclusion of jurors in violation of the equal protection guaranty resulting from the disqualification of jurors to try the issue of guilt who expressed reservations about the imposition of capital punishment lest we be understood at some later stage of this case, or in a comparable proceeding, to have given our implied approval to it.

In addressing ourselves to this basis of decision, we are met at the outset with the vast array of judicial authorities which have approved the existence of beliefs regarding capital punishment as a proper ground for disqualification of jurors for cause in capital cases. As the cases collected in Annotation, Juror-Capital Punishment Scruples, 48 A.L.R. 2d 560 (1965), demonstrate, and the annotator states:

"Upon the theory that conscientious scruples against infliction of the death penalty under any circumstances, or equivalent beliefs, equally disqualify a juror for cause in a prosecution for a capital crime, whether the law prescribes the single punishment of death upon conviction, or invests the jury, upon conviction, with a discretionary power to assess death or life imprisonment according to the evidence and circumstances, the rule has become generally accepted that where the jury is vested with such discretion the state may challenge for such cause because it is entitled to the maximum penalty if the proof shall justify it, and to contend throughout the trial and finally to the jury that the character of the crime justifies it."

A thorough analysis of the state of the law was made in United States v. Puff, 211 F.2d 171 (2 Cir. 1954), where Puff was found guilty of first degree murder without recommendation for mercy under 18 U.S.C.A. § 1111, the federal statute which directs that an accused determined "guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment,' in which event he shall be sentenced to imprisonment for life." Twelve talesmen had been excused for disclosed scruples against capital punishment. Puff sought reversal of the judgment, arguing that, since a jury should be a cross-segment of society, a scruple of fixed belief for or against capital punishment in murder cases was not a disqualification for jury service in a murder case and, therefore, the excuse of talesmen on that ground resulted in an unbalanced jury not truly reflecting contemporary social thought. His contention was rejected and the judgment affirmed.

In arriving at this result, the court reviewed the cases prior to the enactment of the Act of January 15, 1897, 29 Stat. 487, which first permitted the jury to recommend life imprisonment in a first degree murder case, as well as those subsequent to the enactment of the statute. In the latter group the only Supreme Court decision is that of Stroud v. United States, supra, where it was said that a juror should be excused for cause if, from his preliminary examination, it was reasonably certain that, in the event of conviction for murder, the juror would render no other verdict than one which required capital punishment. From the *Stroud* case, the Court of Appeals in *Puff* reasoned that if jurors with bias in favor of capital punishment are disqualified, jurors with bias against the death penalty should be similarly disqualified.[7] The Court concluded that all federal decisions were contrary to Puff's contention.

The Court next considered the decisions of the state courts. It noted three cases [8] in which the defendants argued that the modification of a statute under which the death penalty was mandatory by provision for an alternative punishment by imprisonment with power in the jury to decide between the two alternatives impliedly repealed the disqualification for scruples against capital punishment which had theretofore existed, but where the argument was rejected; it also noted two courts which had held that a challenge for cause on that ground would not lie.[9] The Court collected further the many other decisions in states having statutes similar to the Act of January 15, 1897 in which, absent the specific contentions made in the five courts to which reference has been made, it had been held that scruples against capital punishment are a proper

---

7. This statement in *Stroud* was dictum because, as appears from an examination of both opinions in the same case, the juror to whom reference was made was in fact peremptorily challenged.

8. State v. Owen, 73 Idaho 394, 253 P.2d 203 (1953); Rhea v. State, 63 Neb. 461, 88 N.W. 789 (1902); State v. Riley, 126 Wash. 256, 218 P. 238 (1923).

9. State v. Lee, 91 Iowa 499, 60 N.W. 119 (1894); State v. Wilson, 234 Iowa 60, 11 N.W.2d 737 (1943); State v. Garrington, 11 S.D. 178, 76 N.W. 326 (1898).

ground for disqualification for cause. Following its reference to this imposing array of authority, the Court stated:

"It will be noted that all the cases above cited stem from the fundamental theory that the American jury should be composed of impartial jurors. As a result, a party is entitled to an array of impartial jurors to which he may direct his peremptory challenges. To this a party is entitled as of right. But granted this, a party is entitled to no more. Having no legal right to a jury which includes those who because of scruples or bias he thinks might favor his cause, he suffers no prejudice if jurors, even without sufficient cause, are excused by the judge. Only if a judge without justification overrules a challenge for cause and thus leaves on the panel a juror not impartial, does legal error occur." *Id.*, pp. 184–185.

The Court then turned directly to Puff's contention that the Act of January 15, 1897 should be interpreted to except the general doctrine that scruples against capital punishment constitute a ground of disqualification for cause from application to cases arising under the Act—in other words, that the Act impliedly eliminated scruples or bias against capital punishment as disqualification for cause and sanctioned "balanced juries," which might properly include jurors with such scruples. This argument was rejected, with this statement:

"It will readily be seen that this 'balanced' jury, which the defendant envisages, is in reality 'a partisan jury': if, as he urges, it may include jurors with bias or scruples against capital punishment it must—if it is to have 'balance'—include also those with bias in favor of the death penalty as the punishment for murder. It is settled by Andres v. United States, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055, that under the Statute the verdict must be unanimous both as to guilt

and as to punishment. As a result, as Mr. Justice Frankfurter noted in his concurring opinion, 333 U.S. at page 766, 68 S.Ct. at page 892, [92 L.Ed. at page 1070,] any juror 'can hang the jury if he cannot have his way' as to the sentence which *he* deems appropriate. These considerations lead to the conclusion that trials before 'balanced juries,' even on unanimous findings of guilt, would frequently result in disagreements. And disagreements on successive trials would result in practical immunity from murder. We cannot believe that the Statute was intended to have such a tendency." *Id.*, p. 185.

We have recited at length the reasoning of the Second Circuit in *Puff* because its chain of logic and the authorities which it cites provide the context of our decision today. But in *Puff* there was not recognition that what constitutes partiality of a juror on the issue of punishment does not necessarily constitute partiality of a juror on the issue of guilt, and *Puff* was not decided on a record which developed the substantial systematic exclusion which, by virtue of prevailing community sentiment, inevitably results when jurors, disqualified as to the issue of punishment, are considered to be disqualified automatically as to the issue of guilt. *Puff* established the rule that when a sentencing procedure requires a jury to assess guilt and fix punishment in a single simultaneous verdict, necessarily, a juror, having bias as to punishment, is biased as to guilt. This thesis we reject; and as we later note, even if jury sentencing is established, there are alternatives to the single verdict system when the result thereof is to deny a constitutional right.

In reaching a conclusion opposite to the one reached in *Puff*, we recognize that *Puff* has been uniformly followed by other courts, both state and federal. See, e. g., Pope v. United States, 372 F. 2d 710 (8 Cir. 1967); Tuberville v. United States, 112 U.S.App.D.C. 400, 303 F.2d 411, cert. den., 370 U.S. 946, 82

S.Ct. 1596, 8 L.Ed.2d 813 (1962); [10] Commonwealth v. Subilosky, Mass., 224 N.E.2d 197, 203 (1967); State v. Laws, 50 N.J. 159, 233 A.2d 633, 646 (1967).

The North Carolina Supreme Court has recently addressed itself to this problem, and held that the inability of a juror to join in a verdict *imposing the death penalty* is sufficient ground for disqualification from the jury which is to determine the defendant's guilt or innocence. State v. Childs, supra, 152 S. E.2d at 461. In other words, under current North Carolina practice a prospective juror with conscientious objections to capital punishment is automatically barred from jury service in a capital case, regardless of whether or not he would render a fair verdict on the issue of guilt alone. The same result was reached in People v. Riser, 47 Cal.2d 566, 305 P.2d 1 (1957), where the facts placed the issue in particularly clear focus. In that case, a challenge for cause was sustained when the prospective juror stated on *voir dire* that he was against capital punishment, that in no

event would he join in a verdict imposing the death penalty, but that his objection would not preclude him from finding the defendant guilty.[11]

Many of the authorities cited above have been primarily concerned with statutory interpretation of state laws relevant to the question of whether disqualification of a juror on the ground of conscientious objection to capital punishment has been impliedly revoked by the abolishment of a mandatory death sentence under certain circumstances. However, to the extent that these authorities stand for the proposition that a prospective juror in a capital case may be constitutionally disqualified simply for holding sentiments against capital punishment where death is not the only punishment and where the effect of juror disqualification is to eliminate a substantial portion of the jury venire, we reject them, also.[12]

■ Among the states, there is wide debate as to the abolition or retention of the death penalty.[13] Divers states have

10. At this point it should be noticed that the prosecution in *Turberville* occurred under the District of Columbia statutes at a time that capital punishment was mandatory. D.C.Code § 22–2404 (1961 Ed.). Statements in the case contrary to our holding here are thus dicta.

11. California has adhered to the *Riser* holding, even after the enactment by statute of a two-trial procedure in capital cases. See, e. g., People v. Gilbert, 63 Cal.2d 690, 47 Cal.Rptr. 909, 408 P.2d 365 (1965). It has not yet been decided in New York, which adopted a statutory two-trial procedure like California's, whether the cases which arose prior to the enactment of the statute and which held that conscientious objections to capital punishment are a *per se* disqualification in a capital case, see, e. g., People v. Fernandez, 301 N.Y. 302, 320–321, 93 N.E.2d 859 (1950), are still valid. It has been suggested that the establishment of the two-trial system should remove this ground for disqualification if the prospective juror would nevertheless be able to join in a guilty verdict. See Note, 39 N.Y.U.L.Rev. 50. In our view, such a result may be constitutionally compelled, depending upon the substantiality in the

number of disqualifications which result from a contrary rule.

12. Further, we reject the argument in *Turberville*, adopted in *Pope*, that our inquiry is at an end if we find no systematic exclusion in the general venire because the guaranty against systematic exclusion does not extend to the selection of a particular jury panel. We do not quarrel with the general proposition that a defendant does not have the right to have every element of the community represented on the jury which tries him. Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). But under the practice existing in North Carolina, as freely conceded by its counsel, jurors expressing any conscientious scruple against capital punishment are as surely and certainly excluded from any panel serving in such a case as if they had been excluded from membership on the venire. Where inevitably such jurors will be excused from petit jury service, it is no answer to say that petitioner's rights were not violated because they were members of the array from which the jury to try him was chosen.

13. The Challenge of Crime in a Free Society, p. 143, op. ft. 4, Task Force Report: The Courts, p. 27, op. ft. 4.

resolved the problem in diverse ways, from outright or partial abolition of capital punishment to a system whereby a jury may fix or recommend imposition or non-imposition of capital punishment. We do not enter into the merits of this controversy. Within the framework of the Federal and State Constitutions, the propriety of capital punishment, and when it is to be imposed, are questions reserved for legislative judgment, and the questions are not judicial unless some constitutional guaranty is violated. Nor do we intimate that persons who believe that capital punishment has its function and place are or are not more easily persuaded of guilt—more "conviction-prone"—than those who oppose it. The Second, Eighth and District of Columbia Circuits and the North Carolina Supreme Court have rejected the due process argument that a defendant is prejudiced by being subjected to a trial before a jury, all the members of which do not believe in the abolition of capital punishment.[14] We, believing that it is unnecessary to a proper disposition of this case, do not consider it.

■ Where we depart from prior decisions is that we do hold that belief against capital punishment on the part of jurors who are vested with a dichotomy of functions—the determination of the issue of guilt, and, if guilt is found, the degree of punishment to be imposed —cannot be allowed to disqualify a substantial part of the venire when it is not established that the views of the persons so disqualified will preclude them from making a fair determination on the issue of guilt, aside from the issue of punishment. Such disqualification prevents the jury in its function of determining the issue of guilt from being fairly representative of the community, and thus violates equal protection of the laws.

■ We need not look far for support for the principle that systematic exclusion of any recognizable, identifiable group within the community from which a jury venire is drawn violates the equal protection clause, irrespective of a showing of prejudice. Systematic exclusion, as an invidious practice, has most usually been stricken down where exclusion was based on color, e. g., Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Eubanks v. State of Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); Arnold v. North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964); Chesnut v. New York, 370 F.2d 1, 7 (2 Cir. 1966); sex, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L. Ed. 680 (1940); Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L. Ed. 181 (1946); economic status, Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); Labat v. Bennett, 365 F.2d 698, 719–724 (5 Cir. 1965); or national origin, Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). See also, Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L. Ed. 2043 (1947) (dissenting opinion), which would have disapproved the use of "blue ribbon" juries. The thrust and breadth of the statements employed in condemning these obvious forms of exclusion in some of these cases are worthy of examination in testing the validity of the practice followed in the case at bar, as measured by its result.

In *Glasser*, there was exclusion of women from the grand jury and alleged exclusion of certain women, from the petit jury. Although the conviction was not set aside for either exclusion (because, as to the grand jury, women had been eligible to serve as jurors for only two months at the time the indictment was returned and because, as to the petit jury, there was a failure of proof), the Court made the following significant

---

14. United States v. Puff, supra; Pope v. United States, supra; Turberville v. United States, supra; State v. Childs, supra. Contra: Oberer, Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt? 39 Tex.L.R. 545 (1961).

statement in regard to the composition of a jury:

"For the mechanics of trial by jury we revert to the common law as it existed in this country and in England when the Constitution was adopted. Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854, 70 A.L.R. 263. But even as jury trial, which was a privilege at common law, has become a right with us, so also, whatever limitations were inherent in the historical common law concept of the jury as a body of one's peers do not prevail in this country. Our notions of what a proper jury is have developed in harmony with our basic concepts of a democractic society and a representative government. For 'It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.' Smith v. State of Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84, 86.

"Jurors in a federal court are to have the qualifications of those in the highest court of the State, and they are to be selected by the clerk of the court and a jury commissioner. [Secs.] 275, 276 Jud.Code, [28 U.S.C. secs. 411, 412] 28 U.S.C.A. §§ 411, 412. This duty of selection may not be delegated. United States v. Murphy [D.C.], 224 F. 554; In re Petition for Special Grand Jury [D.C.], 50 F.2d 973. And, its exercise must always accord with the fact that the proper functioning of the jury system, and indeed, our democracy itself, *requires that the jury be a 'body truly representative of the community,' and not the organ of any special group or class.* If that requirement is observed, the officials charged with choosing federal jurors may exercise some discretion to the end that competent jurors may be called. But *they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted.*" (Emphasis supplied) *Id.*, pp. 85–86, 62 S.Ct. p. 471.

*Ballard* also concerned exclusion of women from the grand jury which indicted the defendants and the petit jury which found them guilty. On this ground the defendants' convictions were reversed, with the Court saying:

"It is said, however, that an all male panel drawn from the various groups within a community will be as truly representative as if women were included. The thought is that the factors which tend to influence the action of women are the same as those which influence the action of men—personality, background, economic status—and not sex. *Yet it is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise do not act as a class.* But, if the shoe were on the other foot, who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel? *The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables.* To insulate the courtroom from either may not in a given case make an iota of difference. Yet a flavor, a distinct quality is lost if either sex is excluded. The exclusion of one may indeed make the jury less representative of the community than would be true if an economic or racial group were excluded." (emphasis supplied) *Id.*, pp. 193–194, 67 S.Ct. p. 264.

*Thiel* was a case in which the exclusion was based on economic grounds. Persons who worked for a daily wage were not listed as prospective jurors, as a class, because it was thought jury ser-

vice imposed a financial hardship on them and experience demonstrated that they were usually reluctant to serve and, accordingly, were excused by the trial judge. The case was a civil suit for money damages and the jury returned a defendant's verdict. A new trial was ordered because of the "* * * admitted wholesale exclusion of a large number of wage earners in disregard of the high standards of jury selection." *Id.,* p. 225, 66 S.Ct. p. 988.

In commenting on the proper composition of a panel from which a jury is drawn, the Court said:

"The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, *necessarily contemplates an impartial jury drawn from a cross-section of the community.* Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164 [165], 85 L. Ed. 84, 86; Glasser v. United States, 315 U.S. 60, 85 [62 S.Ct. 457, 471], 86 L.Ed. 680, 707. This does not mean, of course, that every jury must contain representatives of all economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democractic ideals of trial by jury." (emphasis supplied) *Id.,* p. 220, 66 S.Ct. p. 985.

Of course, the *Glasser, Thiel* and *Ballard* cases were decided under the supervisory power of the Supreme Court of the United States over lower federal courts and not avowedly as an announcement of constitutional doctrine. They are, nevertheless, pertinent authorities on the constitutional issue, because each depended upon the authority of Smith v. State of Texas, supra, a decision resting solely on constitutional principles, as authority for the result reached and, over the years, they have generally been so regarded. See, e. g., Brooks v. Beto, 366 F.2d 1, 11.

 North Carolina's practice of excluding persons from the jury selected to determine an accused's guilt or innocence, merely because they have some sentiment or reservation against capital punishment, without any determination that their beliefs would affect their ability to decide the issue of culpability, cannot stand under these Supreme Court decisions condemning systematic exclusion.[14a] In this case, we are told by the representatives of the Attorney Gen-

14a. Explicit and implicit in the separate concurrence of Judge Sobeloff is the argument that petitioner lacks standing to claim a denial of equal protection except as a denial of equal protection mounts up to a denial of due process. It would be shocking to suppose that petitioner is not opposed to capital punishment, at least for himself. More importantly, he, as a defendant in a capital case, has been denied equal treatment with that afforded defendants in non-capital cases who are not tried by juries selected in part by the jurors' notions of punishment; and, as this opinion demonstrates, there is no proper basis for having a death-qualified jury try the issue of his guilt or innocence. Thus, on two scores, he is a member of a class which has been unconstitutionally discriminated against.

Moreover, in such cases as this traditional restrictive rules as to standing are on the wane, if indeed they are still viable. In Glasser v. United States, supra, the standing of a male defendant to challenge exclusion of women was not questioned; and in Ballard v. United States, supra, the conviction of a male defendant was reversed because of the exclusion of women. In Rabinowitz v. United States, 366 F.2d 34 (5 Cir. 1966), the conviction of a white defendant was reversed because of the manner of selection of grand and petit juries which operated to exclude Negroes. Admittedly, these deci-

eral of North Carolina that 30% of any array of veniremen truly representative of the North Carolina community would be ineligible to serve in a capital case, because they have conscientious scruples against capital punishment and because, under North Carolina practice, they would be excused from service for cause. Indeed, in the instant case 45.-33% of the prospective jurors were disqualified on this ground. We do not know the color, or the sex, or the economic status of those who would be disqualified, or those remaining who would be considered qualified. We do not, and need not, know that in determining guilt or innocence they would act as a class. Ballard v. United States, supra. We know only that such a substantial percentage of the populace generally is different from the remaining populace in having a different basic concept of punishment in even the most heinous crimes which may stem, as pointed out in Turberville v. United States, supra, from divers and diverse reasons, from unshakable religious convictions to intellectual or philosophical distaste. Such a group would comprise a variety of views and a variety of approaches and, if allowed to serve, may well have a "subtle interplay of influence" upon the others. Ballard v. United States, supra, p. 194, 67 S.Ct. 261. As a group it would seem as readily *identifiable as the wage earners in* Thiel v. Southern Pacific Co., supra.

 The exclusion of all persons from the jury in a capital case who hold conscientious objections to capital punishment cannot be justified on the ground that it is necessary for the effectuation of the interest of an accused and the interest of society in having a fair and impartial jury determine the guilt or innocence of the accused on the facts as presented to them, and who are not influenced in their judgment by extraneous beliefs regarding one of the possible punishments which might be imposed. There, of course, can be no doubt as to the legitimacy of this interest. But it can be served by the exclusion of a much narrower group than that which was excluded in the instant case—the exclusion of only those whose beliefs would impair their impartiality in determining guilt aside from the question of punishment. It is precisely for this reason that the *voir dire* inquiry should not cease after a determination that the prospective juror is opposed to capital punishment, but should further ascertain whether this opposition would preclude him from making a fair determination on the issue of guilt.

 If a prospective juror's conscientious objection to one of the forms of punishment which the statute allows are so severe as to render him unable to participate, with an open mind, in the jury's deliberations on the culpability of the accused, he is properly challengeable —and should be challenged—for cause. He has demonstrated that he is not an impartial, "indifferent" juror. On the other hand, if a prospective juror with

---

sions did not proceed on constitutional grounds, but the majority opinion in Fay v. People of the State of New York, supra, which did proceed on constitutional grounds, recognized that "[T]here may be special cases" [332 U.S. 293, 67 S.Ct. 1613] where a defendant who is a member of a class not excluded may complain of the exclusion of a class to which he does not belong. A defendant in a capital case would seem to present such a "special case." Allen v. State, 110 Ga.App. 56, 137 S.E.2d 711 (1964), and State v. Madison, 240 Md. 265, 213 A.2d 880 (1965), both cited with approval in Labat v. Bennett, supra, pp. 723–724, reject the traditional requirement of standing. The note, The Defendant's Challenge To a Racial Criterion in Jury Selection: A Study in Standing, Due Process and Equal Protection, 74 Yale L.J. 919, 931–941 (1965), suggests that discretionary application of the principle of *jus tertii* or "impure standing" may be invoked in appropriate cases as an alternative to a requirement of "pure standing," even if the main thesis of the author that racial exclusionary jury cases should be grounded on the due process clause, rather than the equal protection clause, is rejected. The facts before us would lead us to conclude that the instant case is an appropriate one in which *jus tertii* standing should be invoked. All of these reasons lead us to conclude that petitioner has standing.

conscientious objections can, in spite of these objections, make an impartial determination on the issue of guilt, his exclusion, if the class to which he belongs become substantial, works to deny to the defendant his right to have his case judged by a jury representative of the community without serving any recognizable, legitimate interest of the state. Objections to capital punishment may be based on many different stages of belief, and involve subtle nuances of conscience. The function of *voir dire* should be to explore these nuances to determine whether the prospective juror would be able to participate fairly in the deliberations on the issue of guilt, confining his judgment to the facts as presented. Under the equal protection clause, *voir dire* cannot be a blunt instrument of systematic exclusion of a widespread segment of the community whose views do not interfere with the interest which the state seeks to protect.

 It is clear that the real interest which the state is seeking to protect by the *voir dire* practice followed in the instant case is the preservation of capital punishment, as one possible punishment, though not exclusive. This interest provides no firmer justification for the systematic exclusion of a substantial portion of the community from a jury determining the defendant's guilt or innocence. Again, we do not question the legitimacy of this interest, and we do not doubt that permitting persons with conscientious objections to capital punishment to sit on a jury which is both to determine the guilt or innocence of the defendant and to impose his punishment in a capital case may result in some cases in effective nullification of the death penalty. We are also aware of the danger that if jurors, while agreeing upon the guilt of the defendant, adopt intransigent positions on the issue of punish-

ment, no verdict on either guilt or punishment will be returned since a single verdict is required under North Carolina law, and that this might "result in practical immunity from murder" if occurring in successive trials, United States v. Puff, supra. But, the state has *no* constitutional right to the imposition of capital punishment in any case; and a defendant *has* a constitutional protection against systematic exclusion. Moreover, the state's nonconstitutional interest can be served by more narrow measures than the systematic exclusion of a large segment of the community from serving on a jury which is to determine the guilt or innocence of the defendant, and thus such exclusion cannot be deemed necessary to effectuate a valid state interest so as to save it under the equal protection clause.

Other states have avoided or dealt with the problem in other ways. In a minority of the states the problem would not arise because the sentencing function is vested solely in the judge. In the majority of the states, the jury is empowered to recommend or fix punishment in capital cases.[15] Of these California, Connecticut, New York and Pennsylvania have a two-trial system which permits a second jury to pass on sentence and a first jury to return only a verdict of guilt if the first jury is in disagreement as to punishment.[16] The drafters of the Model Penal Code also recommend that guilt and punishment of a defendant be determined in separate proceedings.[17]

 As our disapproval of relevant California decisions indicates, we think that a two-trial system is not immune to constitutional attack, if under it are sustained challenges for cause of substantial numbers of prospective jurors in the guilt phase of the proceedings on the sole ground that they have objections to

15. Task Force Report: The Courts, 26 op. ft. 4.

16. Cal.Penal Code, § 190.1; Conn.Gen. Stat.Ann. § 53–10; N.Y.Penal Code, McKinney's Consol.Laws, c. 40, § 125.35; 18 Penn.Stat.Ann. § 4701.

17. Model Penal Code, § 201.6 (Prop. Final Draft 1962); See also, Tent. Draft No. 9 (1959).

capital punishment without the further determination being made that these objections would interfere with their determination of the defendant's guilt or innocence. However, a two-trial system does provide a practicable means to accommodate the interests of the state in preventing hung juries in successive trials because the original jury cannot agree upon punishment and in preserving the possibility that the death penalty will be imposed. Under such a system, the defendant can be assured that only those persons whose adherence to their conscientious objections to capital punishment is so rigid as to preclude them from making an impartial determination of his guilt or innocence will be subject to a challenge for cause, while the state is simultaneously assured that, if a jury is called for the sole purpose of determining the defendant's punishment, it will be composed only of those persons whose consciences permit them to impose the whole gamut of punishments allowed by statute and that in no event will a guilty verdict unanimously agreed upon be lost by disagreement as to the appropriate punishment.

Under our view of how the existing North Carolina procedure and practice must be accommodated to a defendant's constitutional rights, prosecutors in that state must run the risk that a person who has conscientious objections to capital punishment will either successfully persuade his fellow-jurors that the death penalty should not be imposed on the defendant whose case is being tried or that he will cause the jury to disagree because of disagreement on the issue of punishment, although agreeing on the defendant's guilt. This is so because North Carolina's resolution of the conflict of the interest of the prosecutor in obtaining a jury which is free to sentence the defendant in any manner which the statute allows and petitioner's right to trial by a representative jury by making the state's interest wholly paramount cannot stand under the equal protection clause.

The district judge should issue the writ, staying its effect for a reasonable time, to permit the state to retry the petitioner.

Reversed and remanded.

SOBELOFF, Circuit Judge (concurring specially):

Following a somewhat different route, I concur in the result reached by the court and in most of its opinion. The extent of my disagreement is briefly indicated below.

I find it unnecessary to enter into the discussion between my brethren Winter and Craven as to whether the State has a sufficient interest in the preservation of the death sentence as a possible punishment to permit it to submit the *penalty* issue to a jury composed only of persons having no scruples against capital punishment. Without addressing this interesting but secondary question, I conclude that there has been a violation of the Fourteenth Amendment in this case simply because the issue of *guilt or innocence* was submitted to a jury under the trial court's rulings which systematically excluded for cause every juror entertaining any scruples about capital punishment, and this without even inquiring whether these beliefs would preclude a fair consideration of the guilt issue. I agree that the conviction must be set aside because of the palpably unfair double standard of inquiry which excluded all with any degree of principle against the death penalty while seating one who admitted a bias against the defendant and another who felt that he would be under a mandate to impose the death penalty if the defendant should be convicted. This is the most obvious fault of the trial. But in addition, the procedure was constitutionally defective in the manner in which the list of prospective jurors was systematically combed with the result that the issue of innocence or guilt was tried before a "death qualified" jury.

However, I have conceptual difficulty with the theoretical footing chosen by

the major opinion for invalidating the procedure which resulted in a "death qualified" jury for the determination of guilt as well as punishment. My concern is with the court's refusal to consider the due process argument while placing exclusive reliance on the equal protection clause. I agree unreservedly with Judge Craven that primarily it is due process which forbids the practice employed here.

The underlying idea in all of the jury selection cases relied upon in the major opinion is that the fairness of the trial was impaired by the deliberate empaneling of a jury not truly representative of a cross-section of the community. To my mind, this is essentially a due process concept expressing the Constitution's interdiction of invidious discrimination in the method of jury selection. See Smith v. State of Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940). The inherent objection to the exclusion of prospective jurors on account of race, sex, religion, philosophic belief or economic condition is that it opens the way to a fact finder's partiality, bias and unfairness, which are often difficult to demonstrate in a particular case. These exclusions go to "the very integrity of the fact-finding process" [1] which depends on the presence of an impartial jury truly representative of a cross-section of the community. If this basic condition of representativeness is violated, due

process is denied; and such an exclusion has been held reversible error without a showing of prejudice in the particular case. See Labat v. Bennett, 365 F.2d 698, 723 (5th Cir. 1966). If a venire list has been so manipulated as to become unrepresentative, it cannot be defended as measuring up to minimum constitutional standards of due process. After all, due process is simply the legal expression denoting fairness, and we are agreed that making the selection from an unrepresentative list is not fair.

It is difficult to escape the conclusion that the automatic disqualification of from 30% to 45% of the available jurors in capital cases destroys the representative character of the jury. That the submission of the question of guilt to the special group which remains after the siphoning process has a tendency to favor the prosecution has been affirmed by legal scholars and psychologists.[2] Even though the major opinion refuses to accept these studies, it recognizes that the excluded group, if allowed to serve, "may well have a 'subtle interplay of influence' upon the others." This is enough, for the due process claim stands upon the unrepresentative character of the list, and it is unnecessary to speculate as to the effect this particular group might have if permitted to participate. Ballard v. United States, 329 U.S. 187, 67 S.Ct. 1613 (1946).

1. Linkletter v. Walker, 381 U.S. 618, 639, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

2. The conclusion of these scholars is best summarized by Professor Walter E. Ober-er in his article, "Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?", 39 Tex.L.Rev. 545, 549 (1961):
"The consequence [of excluding jurors with scruples about capital punishment] is that a jury qualified on the death penalty will necessarily have been culled of the most humane of its prospective members. Human sympathy is hardly subject to nice compartmentalization. Jurors hesitant to levy the death penalty would also seem more prone to resolve the many doubts as to guilt or innocence

in the defendant's favor than would jurors qualified on the 'pound of flesh' approach."
See also Adorno, "The Authoritarian Personality" (1950) ; Goldberg, "Attitude Toward Capital Punishment and Behavior as A Juror In Simulated Capital Cases" (1965) (unpublished study reproduced in petitioner's brief at App. 60 filed in the United States Supreme Court in Witherspoon v. State of Illinois, et al., 389 U.S. 1035, 88 S.Ct. 793, 19 L.Ed.2d 822 (1968)) ; Wilson, "Belief in Capital Punishment and Jury Performance" (1964) (unpublished study reproduced in petitioner's brief at App. 66 filed in the United States Supreme Court in Witherspoon v. State of Illinois, et al., 389 U.S. 1035, 88 S.Ct. 793, 19 L.Ed.2d 822 (1968)).

Nevertheless, the major opinion prefers to rely solely on the equal protection clause of the Fourteenth Amendment. It is true, as the opinion notes, that decisions pertaining to the systematic exclusion of jurors are usually couched in equal protection terms. This is because in each of the cases resting on this ground the practice complained of worked to discriminate directly against a particular class to which defendant belonged or with which he was affiliated. An example is the *Smith* case, supra, where a Negro defendant was tried before a jury from which members of his race were systematically excluded while the State tried white defendants without excluding from the jury members of their race. Thus individuals similarly situated were treated discriminatorily by the State, and the equal protection clause was appropriately invoked, without any negative implication as to the applicability of the due process clause. In Eubanks v. State of Louisiana, 356 U.S. 584, 585, 78 S.Ct. 970, 972, 2 L.Ed.2d 991 (1961), the Supreme Court synthesized the equal protection jury exclusion cases in these measured words: "In an unbroken line of cases stretching back almost 80 years this Court has held that a criminal defendant is denied the equal protection of the laws guaranteed by the Fourteenth Amendment if he is indicted by a grand jury or tried by a petit jury from which members of *his* race have been excluded because of *their* race." (Emphasis added.)

In the instant case, the record fails to establish that the defendant, accused of murder, is a member of the class—persons with scruples against capital punishment—which the text of the major opinion clearly holds was accorded discriminatory treatment by the State. To say that the defendant has scruples against capital punishment as to himself fails to distinguish him from any of the jurors who actually tried him or

from mankind in general. Because of their beliefs, otherwise qualified members of the excluded class, unlike individuals from other segments of society were denied the opportunity to adjudicate the guilt or innocence of defendants in capital cases. This is not to say, however, that the defendant has no standing to complain,[3] for denial of equal protection to the excluded class operates to deny him due process by forcing him to trial by a jury chosen from an unrepresentative cross-section of the community. It is only from this perspective that the case may be viewed as one involving a denial of equal protection. The denial of equal treatment to this identifiable group was an integral part of the judicial proceedings which culminated in defendant's conviction. By so demeaning the criminal process, one might contend, the State has violated the defendant's right to due process, "regardless of whom the unconstitutional state conduct may have affected in the first instance." The Defendant's Challenge To A Racial Criterion In Jury Selection: A Study in Standing, Due Process and Equal Protection, 74 Yale L.J. 919, 940, & n. 106, pp. 939-40 (1965). In this limited sense, equal protection and due process may be said to coalesce in this case. But again, the ultimate ground for reversing the conviction would be due process.

If the class excluded be persons with scruples against capital punishment, equal protection alone cannot provide an adequate ground for decision. In every one of the decided cases which grants standing to a person not within the excluded class, the courts speak either not at all of equal protection, or of equal protection coupled with due process; none relies exclusively on equal protection. In Allen v. State, supra, a case involving a white civil rights worker tried before a jury from which Negroes were systematically excluded, the Georgia court unequivocally stated: "When a

3. See Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946); Rabinowitz v. United States, 366 F.2d 34, 37 & n. 1 (5th Cir. 1966); Allen v. State, 110 Ga.App. 56, 137 S.E.2d 711, 714 (1964); State v. Madison, 240 Md. 265, 213 A.2d 880 (1965).

State law provides for indictment and trial by a jury, *due process of law*, in our opinion, includes indictment and trial by juries selected in accordance with the established law, from a list of citizens representing a cross-section of the community." (Emphasis added.)

In a footnote, in apparent departure from the theory of the text, the major opinion suggests that the class involved in this case is capital criminal defendants. The view seems to be that persons charged with capital offenses are treated inequitably compared to those accused of non-capital offenses who are tried before jurors unquestioned about their opinions of punishment. While this suggestion is decidedly unpersuasive, it in no way militates against the use of the due process clause in this case. Due process and equal protection are not mutually exclusive or conflicting to any extent. I read due process as being the broader guarantee of fundamental fairness. For this reason, I cannot envision a mode of jury selection involving an infraction of equal protection that might possibly satisfy the demand of due process.

In addition to due process, there is yet another constitutional basis which supports the court's conclusion. In my view, not only were both due process and equal protection rights under the Fourteenth Amendment infringed, but no less emphatically the defendant's Sixth Amendment guarantee of trial by an impartial jury was violated. This guarantee applies to the states, Parker v. Gladding, 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). A jury is not an impartial one if it has been deliberately drawn from a restricted segment of the population that may reasonably be thought more "guilt oriented" than a random cross-section of the general community.

To this defendant, of course, it matters not at all which ground we rely upon in voiding his trial; the court, however, has a deeper and more enduring concern with relevant legal theory, and it should select the appropriate avenue to decision.

CRAVEN, Circuit Judge (concurring):

I readily concur in the decision of the court. I would go further and reject the court's premise that the state has a legitimate interest in obtaining the death penalty. There is no such state interest and there has not been since the 1949 statute left choice of punishment to the "unbridled" discretion of the jury. With that statutory change of direction the state relinquished its so-called legitimate interest in the death penalty in favor of obtaining *either* death or life imprisonment as equally appropriate punishments. Since either is appropriate, the state has no legitimate interest in the selection of a jury predisposed to either one.

That the jury choice is "unbridled" means only that the jury need not articulate or even consciously have a reason. Certainly it does not mean that jurors are not to reason together on the question of punishment as on all others. I cannot think of a better reason for a recommendation of life imprisonment than questioning the wisdom of capital punishment—whether on religious or other grounds. To rule out such a reason by systematic exclusion of the doubters results in an "unbridled" choice by a death-oriented jury. Any method of jury selection which systematically deprives the accused of cross-sectional community representation violates due process. "The end in view," as Chief Justice Stacy put it for the North Carolina Supreme Court, "is to get a fair cross-section of community judgment." State v. Koritz, 227 N.C. 552, 43 S.E.2d 77, 81 (1947).

It is obvious that there is no such cross-section in a system where 30 percent to 45 percent of otherwise qualified jurors are excluded because their viewpoint on a question within their unbridled discretion is not pleasing to the prosecution. To select a particular attitude of mind or heart—whether for or against the death penalty—and upon it to erect

an exclusionary rule for the selection of jurors in either the guilt or punishment phase of the trial is, in my opinion, fundamentally opposed to the concept of trial by jury and due process.

I would prefer to rest the decision upon denial of due process and infringement of the right to trial by jury rather than denial of equal protection, and I would hold that the defendant is entitled to a jury that has not been screened to avoid the exercise of a fair cross-section of community judgment and that this right applies to the determination of both guilt and punishment.

HAYNSWORTH, Chief Judge (concurring in result):

As Judge Bryan, I concur in the result, but I do so upon the very limited ground of the essential unfairness of excluding every juror who professed an unexamined scruple against capital punishment while seating every juror who professed a belief in capital punishment, including one who stated a belief that he was under a duty to vote for the death penalty in any case of murder. It is enough for me that the *voir dire* inquiry was far from even-handed and that many jurors, whom we would all agree were qualified, were excused for cause. I do not think this record presents any broader question or that it is appropriate for a declaration of new and sweeping constitutional principles.

On this point, the *voir dire* examination of each juror in this case opened with the question, "Do you believe in capital punishment?" If the answer was "No," he was asked a second question, typically, "You have conscientious scruples against it do you?" If the answer to the second question was "Yes," as it predictably was, without any further inquiry and no probing whatever, the court excused the juror for cause. The procedure was in strong contrast to the probing of the juror who reported that he had read of the case in the newspapers and had formed a fixed opinion. He was seated after agreeing that he could eliminate his fixed opinion from his mind and decide the case on the evidence.

It seems clear to me that among the thirty-four jurors excused for cause on this ground there were many who had no more than a philosophical or intellectual antipathy to capital punishment. A large segment of the population today has such an antipathy, in varying degrees, including those who think a death sentence appropriate only in such extraordinary cases as murder committed under aggravated circumstances by a prisoner already under a sentence of life imprisonment for whom the threat of a second sentence of imprisonment would be no great deterrent.[1] There is certainly no showing here that such persons could not subordinate their personal beliefs and follow the court's instructions in considering the guilt or innocence of the defendant and, under North Carolina's practice, approach the question of punishment with a reasonable degree of open-mindedness.

Surely a state in a capital case is not entitled to a jury composed exclusively of the most bloodthirsty of her citizens, and differences in shades of opinion about the appropriateness of capital punishment in particular cases ought not to be allowed as the basis of distinctions affecting the qualification of jurors.

I strongly suspect, too, that among the thirty-four jurors, there were some, or perhaps many, who had not so much as an intellectual antipathy to capital punishment in some classes of capital cases. When it was repeatedly demonstrated to all members of the venire that one could be excused by giving two simple and pat answers to two simple questions, strong temptation was placed before those members who had important business to attend or golf games to play or who, for other reasons, were loath to serve.

1. There is nothing new in such antipathy. It has been responsible for the very substantial progress we have made in the last two centuries from a system in which the death penalty was imposed for most felonies.

There remains the possibility that there were some among the thirty-four jurors who were excused who had such deep-seated notions with religious, moral or philosophical foundations that they could not act impartially in considering the question of guilt or the question of punishment. It is only a possibility, however, for this record shows us nothing, and their number is surely relevant to the broad Fourteenth Amendment issues the court undertakes to decide.

Nor can I find any basis for speculation that some jurors holding unshakable convictions against capital punishment might nevertheless have a substantial capacity for impartial service on the question of guilt or innocence though not on the question of punishment. Usually, the two questions are inextricably intertwined. North Carolina's particular practice may be unusual, but it is not essentially different from the prevalent practice which attributes a binding effect to a jury's recommendation of mercy. Even in a jurisdiction in which the jury's function ends with a finding of guilt or innocence, a juror inflexibly opposed to capital punishment, knowing that the judge, or another jury, is likely to, or even may, impose the death penalty upon a verdict of guilty is very likely to equate a verdict of guilty with a sentence of death. Such a juror will hold out for a verdict of guilt of a lesser offense which does not permit a death sentence. Certainly the record furnishes no basis for a conclusion that there is any substantial number of people in North Carolina or anywhere else who would be capable of impartial service on the question of guilt in a capital case though admittedly in-capable of such impartial service on the question of punishment.

Our speculation is a slender reed, indeed, to support the imposition upon the states, and United States District Courts too,[2] of the extraordinary requirement of bifurcated trials in capital cases. Really what the majority requires is two full trials if the first results in a verdict of guilty, for the second jury can hardly decide the question of punishment without being fully informed of all of the circumstances of the crime, the defendant's defenses and his mental and emotional condition, everything, in short, developed at the first trial.[3]

If the record disclosed the fact, one which seems to me most improbable, that a substantial number of the jurors excused held such firm convictions against the imposition of the death sentence as to be disqualified from service on the question of punishment and yet were capable of impartial service on the question of guilt or innocence, we would be met with the question the majority undertakes to resolve. When the record fails to reveal a single juror who could be so classified, I think we far exceed our judicial function in deciding a question which a different record conceivably might present. Deciding hypothetical issues is bad enough when the only consequences are felt in the immediate litigation; it is quite intolerable, to my mind, when it imposes far-reaching and extremely costly consequences in the general administration of criminal justice.[4] If the unlikely question ever is presented to a court, it will be time enough to face it then.

Because the state judge did not follow the even-handed approach approved in

2. Under 18 U.S.C.A. § 1111, the penalty for murder in the first degree within federal jurisdiction is death unless the jury qualifies its verdict with the words "without capital punishment," in which event the penalty is life imprisonment. A federal jury thus determines the punishment as does a North Carolina jury.

3. They should have a great deal more, particularly the kind of information of which a judge may avail himself through a pre-sentence report.

4. Our judicial systems for the administration of criminal justice are suffering great stresses now as a result of assumptions of ever-increasing burdens. Ways must be found to shoulder those additional burdens which are necessary, but the needless imposition of very weighty and costly additional burdens cannot be afforded.

such cases as Pope v. United States, 8 Cir., 372 F.2d 710,[5] I concur in the result. I do not think any other question is presented on this record, and I think the court makes a grave mistake in undertaking to decide any other question.

I am authorized by Judge Bryan to say that he joins in this opinion.

BOREMAN, Circuit Judge, joining with Chief Judge HAYNSWORTH in concurring in result:

I, too, concur in the result reached by the majority insofar as the conviction is set aside and the opportunity is provided for the state to retry the petitioner. I readily join with Chief Judge Haynsworth in his separate statement of concurrence in the result which I adopt.

I would emphasize the thought that the court exceeds its judicial function in unnecessarily deciding a question which is not presented by the present record and I echo Judge Haynsworth's observation that the decision of the majority "imposes far-reaching and extremely costly consequences in the general administration of criminal justice. If the unlikely question ever is presented to a court, it will be time enough to face it then."

ALBERT V. BRYAN, Circuit Judge, concurring in result, but dissenting from the reason, of the decision.

I agree with reversal of the judgment on review, but I disagree with the majority's decisional premise: the successful challenge by the State of veniremen who were opposed to capital punishment. In my view no clause in the Constitution forecloses this judicial practice by North Carolina.

Staunch precedent for this conclusion is found in the cases cited but discarded by the majority. E. g.: Pope v. United States, 372 F.2d 710 (8 Cir. 1967); Turberville v. United States, 303 F.2d 411 (D.C.Cir. 1962), cert. den. 370 U.S. 946, 82 S.Ct. 1596, 8 L.Ed.2d 813; United States v. Puff, 211 F.2d 171, 182 (2 Cir. 1954), cert. den. 347 U.S. 963, 74 S.Ct. 713, 98 L.Ed. 1106. A few quotations from them will, I think, demonstrate the soundness of their holdings.

*Puff*, supra, was decided in 1954 under the present Federal murder statute, 18 U.S.C. § 1111. To sustain its view that the exclusion of veniremen for convictions opposing capital punishment, the Court, in *Puff*, quoted from Logan v. United States, 144 U.S. 263, 298, 12 S.Ct. 617, 628, 36 L.Ed. 429 (1892) as follows:

"As the defendants were indicted and to be tried for a crime punishable with death, those jurors who stated on *voir dire* that they had 'conscientious scruples in regard to the infliction of the death penalty for crime' were rightly permitted to be challenged by the government for cause. A juror who has conscientious scruples on any subject, which prevent him from standing indifferent between the government and the accused, and from trying the case according to the law and the evidence, is not an impartial juror. * * * And the principle has been applied to the very question now before us by Mr. Justice Story in United States v. Cornell [Fed.Cas. No. 14,868], 2 Mason, 91, 105, and by Mr. Justice Baldwin in United States v. Wilson [Fed.Cas. No. 16,730], Baldw., 78, 83, as well as by the courts of every state in which the question has arisen, and by express statute in many states."

Similarly, *Turberville*, supra, when passing upon the very question now be-

---

5. It appears in that case that ten jurors were excused after acknowledging such deep-seated scruples against capital punishment as to prevent them from imposing it even though they conscientiously thought such punishment proper under the law and on the evidence. On the other hand, three other jurors were excused after indicating they thought the death penalty should be imposed upon one who committed a homicide in the course of a bank robbery regardless of the circumstances as disclosed by evidence.

fore us reasoned in the tenor of *Puff*, and also said:

"What [appellant] is really asserting is the right to have on the jury some who may be prejudiced in his favor— i. e., some who are opposed to one possible penalty with which he is faced. *We think he has no such constitutional right.* His right is to absolute impartiality." (Accent added.)

*Pope*, supra, fully approved the attitude of *Turberville* and *Puff*, with the following supplement:

"The defense position comes down to a demand, not for an impartial jury which is neutral, but for something quite different, namely, a jury which includes persons who are prejudiced against—and, also, possibly for—capital punishment.

"We are also not persuaded by the argument that the trial court's exclusion of these persons served improperly to produce a panel which was something less than representative of the community. In a narrow sense this might be said but one could say the same thing in the same sense when a court very properly asks those persons to step aside who are personally acquainted with counsel for the prosecution, or who cannot read, or who cannot understand the English language. To that extent the panel is always a little less than representative of the community as a whole. But this exclusion does not produce an unfair jury or an illegally unrepresentative one or one which is not impartial in the Sixth Amendment sense. . . ."

As did these Courts, I feel that this principle governs whether or not the statutes exact capital punishment mandatorily or allow an optional verdict of life imprisonment.

Epitomized, my thinking is that in a trial under a statute like the one now considered, the question of the penalty is by present law injected into the question of guilt, and the act's validity is not doubted by the Court. A juror cannot vote "guilty" without qualification. Andres v. United States, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055 (1948). Therefore, if his conscience will not permit him to cast a ballot for the extreme penalty, he would be prevented from unqualifiedly declaring his equally conscientious conviction of the accused's guilt. He must stand aside as unacceptable because, although convinced of guilt beyond a reasonable doubt, he could not so say unconditionally. The statute plainly requires that, if the jurymen determine the defendant to be guilty of a capital offense, they must announce either the death penalty or life imprisonment. A juryman who has scruples about taking the life of one he finds guilty of committing a capital offense has not a freedom of choice between capital punishment and life imprisonment.

No Constitutional invalidity is raised against the statute, and I perceive no fundamental bar to the State's rejection as a juryman of a venireman conscience-bound against capital punishment. It is a perfectly understandable tenet and I imply no derision of the scruple. Nor do I intimate any view of the right or wrong of the death penalty. I say only that it is a question for determination by the State, not one for the Federal courts in passing upon State laws.

Reference is made by the majority to the percentage of persons in North Carolina averse to execution for crime. Granted the accuracy of these figures, I doubt the soundness of accepting the poll as representative of State or even community opinion. Rather I would look to the expressions of the North Carolina legislature in its enactments. The criminal statute here under study has remained the law of North Carolina for many years, and to me this is indicative of the public judgment on capital punishment. If the citizens of the State were unwilling to follow the statute, I have no doubt it would be promptly repealed or otherwise modified. Again, this action is not for the Federal courts.

However, I would reverse the conviction here for disallowance of the defense challenge to a venireman who held it his *duty* to inflict capital punishment should the defendant be found guilty of murder. Cf. Stroud v. United States, 251 U.S. 15, 20, 40 S.Ct. 50, 64 L.Ed. 103 (1919); United States v. Puff, supra, 211 F.2d 171, 182. Moreover, there was trial error in the admission of inflammatory evidence and advertence before the jury to the defendant's prior criminal record. These incidents necessitate a new trial, and for that reason I concur in the determination of the court to reverse.