104 So.2d 391 (1958)
R.C. HARRISON, Appellant,
v.
STATE of Florida, Appellee.
No. A-279.
District Court of Appeal of Florida. First District.
July 17, 1958.
*392 R.C. Harrison, in pro. per.
Richard W. Ervin, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., for appellee.
WIGGINTON, Judge.
Appellant was charged in the Circuit Court of Jackson County with the crime of grand larceny, for which crime he was convicted, adjudged guilty and sentenced to imprisonment in the state prison for a term of five years. This appeal assigns as error the insufficiency of the evidence to support the verdict and judgment.
The evidence adduced by the State was entirely circumstantial. The defendant offered no evidence and elected not to testify in his own behalf.
The evidence shows that defendant was employed by his uncle, E.D. Harrison, as a farm hand for some six months prior to the alleged larceny and was paid for his services at the rate of $3 per day plus certain meals. On January 22, 1957, defendant, together with members of his immediate family, and the uncle and his wife drove to Marianna. At that time the uncle had in his possession cash in excess of $1,300, from which he purchased an automobile license tag and a pair of shoes for his wife, and made a loan of $5 to defendant's mother, purportedly for defendant's benefit. Around noon the entire party returned to their respective homes in the northern part of the county near the community of Malone. The distance between their homes and Malone does not appear from the evidence. Defendant and his family debarked from the uncle's car at the cross-roads and the uncle, accompanied by his wife, proceeded to his home, where they remained for the rest of the day and night. Defendant was not seen again by the uncle until shortly before the trial of this case.
The uncle testified that around 8:00 p.m., after returning home from Marianna on the day in question, he took his money from his "Sunday pants" and placed it in the pocket of a "brand new pair of overalls." At that time he had three or four fives, four or five ones, and one ten dollar bill; the remaining $1,300, he was positive, was in twenty dollar bills. After "snapping" the pocket containing the money, the uncle placed the overalls on the table between the beds on which he and his wife slept. The couple retired around 10:00 p.m. that night and slept until around 11:00 p.m. when they were awakened by rain or some unidentified noise. The uncle left his bed and went outside the house, but seeing nothing unusual returned to the bedroom where he discovered his overalls on the floor under the bed and the table moved. Neither of the couple was sufficiently alarmed at the time to check on the money that had been placed in the overalls pocket. The next morning the pocket was examined and the money was discovered missing. The uncle was permitted to express his positive opinion at the trial that defendant was guilty of the theft of his money. This opinion, which was later admitted to be *393 only a strong suspicion, was apparently based in part upon the fact that the uncle owned a bulldog that would not allow strangers on the premises; that defendant was friendly with the dog; and that the defendant failed to report for work on the morning following the theft. Further, according to defendant's uncle, defendant had been present on numerous occasions when the "hands" were being paid and was the only person who knew he kept large sums of money. But, defendant had not seen his uncle's money while they were together on the day of the theft. The record is silent as to whether the uncle's bulldog was at home on the night in question or whether he had other friends. Likewise, just how the defendant came to be the only person who knew of the uncle's wealth when large sums were apparently displayed to the other "hands" is not made clear.
The State produced one Hatcher who testified that he saw the defendant around midnight on the date of the alleged theft when he came to the witness' home, the location of which is not disclosed, seeking a ride to Marianna or Malone; that enroute to Malone he stopped at defendant's home where he heard the defendant tell his mother "that was a hundred dollar bill I gave you;" that the two then proceeded to the "oil mill" at Malone where defendant gave the witness a dollar bill in payment for his transportation, which was the only money he saw in defendant's possession; and that he, the witness, then returned to his home.
One Baxter testified that he met the defendant at the "peanut mill" in Malone on the night of the theft and agreed to transport him to Marianna for $5. According to this witness, defendant stated he was going to Dallas, Texas, to visit his wife who was allegedly hospitalized there. Further, while enroute to Marianna, defendant offered to purchase the witness' car for $500 and "slipped" the witness five one hundred dollar bills. The deal was called off when the witness said defendant would have to drive him back to the mill before the sale would be consummated. Upon arriving in Marianna the witness drove defendant to a cab company owned by one Callaway and left him there at about 1:00 a.m. Defendant paid the witness with a twenty dollar bill and received $15 in change.
Callaway testified that he was called to the office of his company at around 1:00 a.m. on the morning after the alleged theft and there met the defendant, who stated he wanted to hire a cab to drive him to Lakeland, Florida, for the alleged purpose of accepting employment with a construction company in that area. The witness agreed to furnish a cab for defendant's trip for $80, whereupon defendant produced a "roll of money" and paid the agreed price with a one hundred dollar bill. One Dozier, the cab driver who transported defendant to South Florida, testified that he saw the defendant with a "roll of bills," but did not know the amount or denomination. He also testified that the defendant appeared as any one else in a hurry to get somewhere, but that his conduct was not otherwise unusual.
Defendant's motion for directed verdict was denied and the cause was submitted to the jury on the State's evidence alone, the defendant having elected not to offer any evidence.
From the foregoing facts it clearly appears that the only circumstances from which guilt could be reasonably inferred were the defendant's unexplained acquisition of a large sum of money and his sudden departure from home on the night the crime was alleged to have been committed.
Where the larceny of money is at issue, evidence tending to show the accused had no money before the larceny and considerable money thereafter is admissible, since a sudden and unexplained possession of means about the time a larceny is committed has the tendency to *394 connect the defendant with the crime where there are other circumstances to support it. One such supporting circumstance has been held to be the fact that money in the possession of the accused corresponds in description to that which was stolen.[1] It is well settled that exclusive possession of the whole or some part of stolen property by a defendant recently after a theft, is sufficient when standing alone, to cast upon the accused the burden of explaining how he came by it, or of offering some explanation, and, if he fails to do so, to warrant the jury in convicting him of larceny.[2]
In the instant case the State's own evidence conclusively showed that the stolen money consisted of $1,300 in twenty dollar bills, together with a few ones and fives, and one ten dollar bill. The money seen in defendant's possession consisted almost exclusively of one hundred dollar bills. Furthermore there is no positive evidence that the defendant here in fact had no money prior to the larceny charge but merely the inference that such was the case. Considering that the theft here charged necessarily occurred in the middle of the night, and in a rural community, we do not consider that the jury could with justification infer that the defendant, in a matter of not more than some ninety minutes, converted some if not all of the $1,300 in stolen twenty dollar bills into one hundred dollar bills. Such an inference would necessarily assume the defendant anticipated capture and therefore sought to alter the identity of the stolen money, either through some innocent party or through a prearranged accomplice. While there may be instances in which an assumption of this nature would be warranted, we cannot concede that it is proper or reasonable when, as here, there is a complete absence of any supporting evidence. Although questions of fact and the inference to be drawn therefrom are for the jury, it cannot be permitted to pyramid assumption upon assumption and intent upon intent in order to reach a conclusion predicated upon circumstance.[3]
Thus, we are left with defendant's act of leaving under the circumstances heretofore described. The flight of a person accused of a crime raises no presumption of guilt, but is a circumstance that goes to the jury to be considered by it with all other testimony and circumstances and given such weight as the jury may determine it entitled to. The rule is that when a suspected person in any manner endeavors to escape or evade a threatened prosecution, by flight, concealment, resistance to a lawful arrest or other ex post facto indication of a desire to evade prosecution, such fact may be shown in evidence as one of a series of circumstances from which guilt may be inferred.[4] At the time the defendant in this case left his home he was neither suspected nor accused of having committed the crime in question. Defendant's leaving at a time which could have been after the crime, although at an unusual hour, is, when standing alone, no more consistent with guilt than with innocence. For aught that appears in the record defendant's conduct could as readily have constituted a mere coincidence.
When circumstantial evidence is relied upon for conviction in a criminal case, the circumstances, when taken together, must be of a conclusive nature and tendency, leading on the whole to a reasonable and moral certainty that the accused, and no one else, committed the offense.[5] If the facts in proof are equally consistent with some other rational conclusion than that of guilt, the evidence is insufficient. If the evidence leaves it indifferent as to *395 which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence cannot amount to proof, however great the probability may be. It is the actual exclusion of each other reasonable hypothesis which clothes mere circumstances with the force of proof.[6] Circumstantial evidence which leaves nothing more than a suspicion that the accused committed a crime is not sufficient to sustain a conviction.
We are fully aware of the burden which our system of jurisprudence places upon those charged with enforcement of the law. In the absence of positive evidence resort must be frequently made to circumstances. When evidence of this kind is relied upon for conviction, it should be acted upon with extreme caution. Our responsibility in such cases  human liberty being involved  is doubly great.[7] The cloak of liberty and freedom is far too precious a garment to be trampled in the dust of mere inference compounded. As was stated in Adams v. State,[8] this court is fully cognizant of the rule that conviction may be had upon circumstantial evidence alone, and although the State's burden does not extend to an absolute metaphysical and demonstrative certainty in proving a crime by circumstantial evidence, it must be sufficient as to every essential element of the crime charged to meet the requirement of the rule as set forth above. When measured in a light most favorable to the State, the evidence adduced in this case is not sufficient to close the gap to the reasonable hypotheses of innocence; and is therefore insufficient to sustain conviction.
From our view of the record we are convinced that the interests of justice would best be served by the granting of a new trial. Accordingly, the judgment appealed from is reversed and the cause hereby remanded for a new trial.
CARROLL, DONALD K., J., concurring.
STURGIS, C.J., dissenting.
STURGIS, Chief Judge (dissenting).
I dissent because I am persuaded that the state maintained its initial burden of making out a prima facie case for conviction, which the defendant elected not to rebut.
Man's senses are nothing more than equipment that registers experience and enables him to draw inferences. The only thing of which he is positive is that he lives, and the judges among us can be no more certain of that fact than are the jurors. Under our system of criminal jurisprudence, however, it is the jurors who are empowered to measure the relative strength of testimony that admits of several inferences and to accept that inference which they believe to be correct. On that predicate, I respectfully submit that it is judicial speculation and an unwarranted invasion of the jury's prerogative to hold that the jury in this case could not "with justification infer that the defendant, in a matter of not more than some ninety minutes, converted some if not all of the $1300 in stolen twenty dollar bills into one hundred dollar bills."
Moreover, I do not believe that in order to convict it was necessary for the state to establish that the bills of $100 denomination traced into the hands of the defendant were the converted form of some of the stolen money, which consisted primarily of $20 bills. Such was only one of many facts and circumstances which in the aggregate required an explanation that the defendant elected not to give. In my opinion the evidence concerning $100 bills might have been entirely eliminated without relieving the defendant of the burden of *396 overcoming what I consider to be a prima facie case of guilt as made out by the state. Assuming the contrary, I suggest that the record shows ample opportunity within the mentioned ninety minute period for the defendant to make conversion of the stolen money into bills of larger denomination. That opportunity existed between the time of the theft and the time defendant awakened the witness Hatcher and hired him as the first of three persons hired to transport the defendant by automobile on a voyage that originally had Texas as its destination, was later changed to Lakeland, Florida, and eventually wound up at Lake Worth, Florida. A very full opportunity also existed when defendant stopped by his home, where he saw his mother and had an unusual transaction with her regarding a supposed $100 bill.
Among the facts before the jury which the defendant elected not to explain are these: His sudden flight in the middle of the night of the theft without announcing to his employer his intention to depart or whence he was going; the contradictory statements made by him on that night to the several witnesses as to the reason for his nocturnal venturing and the need for their services in transporting him; the spending by one in his circumstances of approximately $100 for taxi fares that night and winding up in Lake Worth, Florida, instead of his originally announced destination of Texas; his definite offer to purchase one of the automobiles hired by him that night for a part of his unusual trip, and his quick withdrawal of the offer when it was accepted on condition that he take the owner back to the owner's home, a retracing in the direction of the crime. These actions, coupled with the facts stated in the main opinion, appear to me to be consistent with guilt and so inconsistent with innocence that the jury was warranted, absent any explanation on the part of defendant, to find a verdict of guilty.
In so concluding I am not unmindful of and I highly respect the constitutional right of the citizen not to be compelled to bear witness against himself, and his concomitant privilege to refrain from testifying in his own defense. This privilege should have no greater dignity than the duty of the citizen to organized society. It should not shackle society's ability to convict one who fails to abide by its laws. When the accused elects to exercise the privilege of remaining silent in the face of competent evidence that loudly cries for the refutation or explanation that his voice alone can give, he takes the calculated risk of having the jury finally construe to his disadvantage every inference supportable by the evidence before it. As pertinently observed by Anderson, Associate Justice, dissenting in Trafficante v. State, Fla., 92 So.2d 811, 816:
"To my mind there is no more damning evidence of guilt than the failure of a defendant, in a criminal case, to take the stand, face his accusers, the judge, the jury, and the prosecuting attorney and say, `I am not guilty.'"
Upon an appeal from a conviction under such circumstances I would reverse only if the evidence allows no inference upon which guilt could be predicated.
The facts here are clearly distinguishable from those in Adams v. State, Fla., 102 So.2d 47, in which we reversed the lower court because of the insufficiency of circumstantial evidence. In that case the defendant lived about 100 miles from the scene of the theft, he had no connection with the owner of the stolen property, he made no sudden departure from his place of residence at the approximate time of the crime, and he did not at that time engage in an unusual and unexplained course of action upon which the jury could reasonably draw the inference that he was fleeing from the crime charged, as did the defendant in the case now on review.
For the reasons stated, I would have affirmed the conviction.
NOTES
[1] Thompson v. State, 58 Fla. 106, 50 So. 507.
[2] Tilly v. State, 21 Fla. 242.
[3] Gustine v. State, 86 Fla. 24, 97 So. 207.
[4] Blackwell v. State, 79 Fla. 709, 86 So. 224, 15 A.L.R. 465.
[5] Parish v. State, 98 Fla. 877, 124 So. 444.
[6] Mayo v. State, Fla. 1954, 71 So.2d 899.
[7] Head v. State, Fla. 1952, 62 So.2d 41.
[8] Fla., 102 So.2d 47.