John A. WAGNER and J. Paul Peek, Appellants,

v.

UNITED STATES of America, Appellee.

No. 17180.

United States Court of Appeals Fifth Circuit.

Feb. 25, 1959.

Rehearing Denied April 9, 1959.

Cecil C. Bailey, Theodore W. Glocker, Jr., J. Edwin Gay, Jacksonville, Fla., Fletcher G. Rush, Orlando, Fla., Lucius A. Buck, Jacksonville, Fla., for appellants.

Richard Kelly, Asst. U. S. Atty., James L. Guilmartin, U. S. Atty., Tampa, Fla., for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

RIVES, Circuit Judge.

The appellants were indicted on 21 counts, all but five of which—Counts 1, 6, 13, 20, and 21—were dismissed on motion. Count 1 charges both appellants with conspiracy; Count 6 charges the appellant Peek with bribery; Counts 13, 20, and 21 charge the appellant Wagner with making false entries of competitive bids on Government purchase orders. Peek was President of Orlando (Florida) Fuel Oil Company, Inc., a dealer in fuel oil, and Wagner was a civilian employee of the Government in the purchasing or contracting office at Orlando Air Force Base.

The trial extended over thirteen days and the printed record consists of 1647 pages, in addition to which there are

many original exhibits. Each defendant was found guilty on the counts directed against him and was sentenced to imprisonment for three years. On appeal two main classes of claimed error are urged: (1) failure to direct a judgment of acquittal as to each count of the indictment; (2) erroneous oral argument of Government counsel.

## I.

■ This sufficiency of the proof as to each count of the indictment was properly preserved for review by motion for judgment of acquittal.

Count 1 charged that from February 27, 1951, to July 8, 1953, Wagner and Peek conspired to defraud the United States; that, in the negotiating of contracts for the purchase and delivery of fuel oil to the Air Base, Wagner was required to obtain at least three competitive bids from fuel oil suppliers in the vicinity of the Base; that they conspired for Wagner to make purchases of fuel oil without obtaining such competitive bids as he "was then and there required to do by virtue of Air Force procurement regulations existing on the said 27th day of February, 1951, and at all times thereafter named in said indictment"; that the price agreed upon by the defendants was in excess of a price per gallon which the Base could have obtained in the absence of the conspiracy. The overt acts alleged consisted of various payments of money by Peek to Wagner and various awards of purchase orders for fuel oil by Wagner as Contracting Officer to Orlando Fuel Oil Company, Inc.

The appellants insist that the Government failed to prove the unlawful conspiracy or any action of the conspirators thereunder. First, the appellants contend that during the time covered by the indictment competitive bids were not required by the Air Force procurement regulations as alleged in the indictment. The Armed Services Procurement Act of February 19, 1948, 62 Stat. 21, had required advertising and competitive bids for nearly all purchases in excess of $1000, but Section 2(c) (1) of that Act

provided "that such purchases and contracts may be negotiated by the agency head without advertising if—(1) determined to be necessary in the public interest during the period of a national emergency declared by the President or by the Congress." The President declared the existence of a national emergency on December 16, 1950, Proclamation No. 2914, 50 U.S.C.A.Appendix note preceding section 1; and on December 18, 1950, the Assistant Secretary of the Air Force authorized—" * * * the negotiations of all purchases and contracts by the Department of the Air Force under Section 2(c) (1) of the Armed Services Procurement Act of 1947 during the period of said National Emergency."

Under the Armed Services Procurement Act of 1947, the Defense Department had promulgated procurement regulations governing all of the Armed Forces, 15 Federal Register 8025–8052. Procurement Procedures of the Regulations of the Department of the Air Force appear in 15 Federal Register 8970–8992. Section 402.101 of the Armed Services Procurement Regulation provides in part:

"Whenever supplies or services are to be procured by negotiation, price quotations, supported by statements and analysis of estimated costs or other evidence of reasonable prices and other vital matters *deemed necessary by the Contracting Officer,* shall be solicited from all such qualified sources of supplies or services as are *deemed necessary by the Contracting Officer* to assure full and free competition with the procurement of the required supplies or services, in accordance with the basic policies set forth in Subpart C of Part 400 of this subchapter, to the end that the procurement will be made to the best advantage of the Government, price and other factors considered." (Emphasis supplied.)

The Air Force Regulation, Section 1002.202, implementing the Armed Services Procurement Regulation, states:

"In general, at least two informal quotations of prices will be requested from regular dealers in, or manufacturers of, the articles required. *Where circumstances permit, quotations will be solicited from all such qualified sources as are deemed necessary by the contracting officer* to assure full and free competition consistent with the procurement." (Emphasis supplied.)

Under the italicized provisions of those regulations, the Contracting Officer had established a policy of obtaining at least three "informal quotations of prices," before making purchases, and those, we think, may fairly be termed "bids." That Wagner understood that requirement is shown by his notation on the back of the mimeographed form "Purchase Memorandum" of three quotations, the lowest being that of Orlando Fuel Oil Company. The Government's evidence tended to show that a number of the quotations so entered had not, in fact, been solicited or supplied. Peek probably did not know of the particular regulations under which the three quotations were required, but the jury could draw the inference that he knew of the policy and knew that Wagner had to obtain other bids or quotations to obtain "full and free competition."

 Two of Peek's competitors testified that they would have sold and delivered the fuel oil at a lower price than that obtained by Orlando. In our opinion, however, that proof was unnecessary, for once the conspiracy to defraud was established it was not necessary to show that the fraud was actually perpetrated. The crime consists of entering into the conspiracy and is complete as soon as one or more of the conspirators does an overt act to effect the object of the conspiracy. 18 U.S.C.A. § 371, and cases cited in notes 144 and 147 thereto. Some of the overt acts charged are the subjects also of substantive offenses for which each of the defendants was indicted and which will presently be discussed. We conclude that there was sufficient evidence to justify submission of Count 1—the conspiracy count—to the jury.

 Count 6 charges Peek with giving a bribe to Wagner to corruptly induce Wagner to purchase fuel oil for the United States from Orlando Fuel Oil Company without securing competitive bids from other fuel oil suppliers. The "thing of value" was the cancellation of Wagner's indebtedness to Orlando Fuel Oil Company in the amount of $133.39. Peek, as President of that Company, had made out a credit memo which instructed the bookkeeper to write the account off the books of the Company. Wagner testified that he was not informed of this action, and there is no direct evidence that he was so informed. Further, on October 10, 1951, when the indebtedness was canceled, the Air Force Base was procuring its fuel oil from Orlando Fuel Oil Company under an Armed Services Procurement Contract issued out of Washington, D. C., covering the period from July 1, 1951, to December 31, 1951. If the evidence under Count 6 were sharply separated from that under Counts 13, 20, and 21, presently to be considered, we would not think that the jury could properly infer that Wagner knew of the cancellation of his indebtedness or that Peek was looking to the future, after December 31, 1951, and that he canceled the indebtedness as a bribe to induce Wagner's omission of competitive bids after that date. In the light of the strong evidence on those three counts, however, we think that the jury could draw the necessary inferences as to Count 6.

 Charges 13, 20, and 21 charged Wagner with making false entries of competitive bids on particular Government purchase orders in violation of 18 U.S.C.A. § 1001. We think that the mimeographed "Purchase Memorandum," on the back of which the entries of the three bids were made, was a part of the purchase order, or certainly that any variance was not substantial. See, Cromer v. United States, 1944, 78 U.S. App.D.C. 400, 142 F.2d 697, 698; Rathbun v. United States, 10 Cir., 1956, 236

F.2d 514, 516. There was positive evidence that none of the three listed bids other than that of the Orlando Fuel Oil Company had actually been made. The books and records of the Orlando Fuel Oil Company listed various cash payments to Wagner as well as payments in the form of checks as business expenses for advertising, travel, etc. Over the period January 1952 to May 1952, the Government purchases from the Orlando Fuel Oil Company and the payments to Wagner bear an obvious mathematical relationship:

| | Purchase | |
| --- | --- | --- |
| Govt. Exhibit | Amount | Date |
| 37 | 16,000 gallons | 1– 3–52 |
| 38 | 20,000 gallons | 1–23–52 |
| Total | 36,000 gallons | |

| | Payment | |
| --- | --- | --- |
| Govt. Exhibit | Amount | Date |
| 57A | $360.00 (check) | 2– 2–52 |

| | Purchase | |
| --- | --- | --- |
| Govt. Exhibit | Amount | Date |
| 39 | 17,000 gallons | 2–29–52 |

| | Payment | |
| --- | --- | --- |
| Govt. Exhibit | Amount | Date |
| 56 | $170.00 (check) | 3–17–52 |

| | Purchase | |
| --- | --- | --- |
| Govt. Exhibit | Amount | Date |
| 36 | 13,000 gallons | 4– 8–52 |

| | Payment | |
| --- | --- | --- |
| Govt. Exhibit | Amount | Date |
| 55 | $130.00 (check) | 4–25–52 |

| | Purchase | |
| --- | --- | --- |
| Govt. Exhibit | Amount | Date |
| 40 | 7,000 gallons | 5– 8–52 |

| | Payment | |
| --- | --- | --- |
| Govt. Exhibit | Amount | Date |
| 58 | $70.00 (cash) | 5–14–52 |

The proof of corruption for the jury's consideration was indeed strong. The inference was clear that Peek was paying Wagner one cent per gallon for each gallon of fuel oil sold and delivered to the Government, and that Wagner's entries of competitive bids were knowingly and willfully false.

## II.

The oral arguments of counsel to the jury have been reported in full and comprise 77 pages of the printed record. The defendants' counsel did not interpose any objections to the oral argument of Government counsel. The opening argument for the Government is well

reasoned and strongly worded. It does refer to Peek as "a businessman who is greedy" and to Wagner as having "over-indulged in alcohol," but these character-izations were based on the evidence. The opening argument refers also to the dif-ficulty of going "into a company's books —especially when that company is charg-ing off bribes as advertising and bird dogs and so forth, and so on, and charg-ing that off as a business expense." If objectionable that could certainly have been corrected by the district court up-on the interposition of a proper objec-tion.

■ In his closing argument, Govern-ment counsel virtually threw discretion to the wind, as is indicated by the follow-ing excerpts:

"Mullins said that his price would have been not more than 15 cents, and Johnson said his price would have been not more than 14 and a half cents. And if you could have gotten in and started asking him 'Well, what about 73,000 gallons in five months?' 'Then what would your price have been?' They didn't let me do that. They objected. That is hypothetical—blah? blah? and so forth."

Defendants' case should not be prej-udiced by criticizing their counsel for making reasonable objections to the in-troduction of testimony. Further, this criticism had a tendency to prejudice the defendants if their counsel should object to parts of the oral argument as im-proper.

"Then they went on and they tried to tell you, 'Well, Peek didn't make any money.' Somehow or other I can't get too concerned about that. I have an idea that Peek did make some money. I think I will worry about something else that is worthy of it.

"I think Peek was in the business and he made a lot of money.

"Now, I don't think he got rich on just what we have got here, but re-member, this case is restricted to just fuel oil. That's all. That is the only petroleum product that we are involved with here, is fuel oil. And if you think this case has been con-fused, try and visualize what it would have been with all petroleum products—stacks and stacks of files."

Relatively small amounts of money were involved in any profits made by Peek from the fuel oil sold to the Govern-ment during the period covered by the indictment. This argument was a plain effort to have the jury believe that Peek and Wagner were guilty of other and more profitable frauds. It was a wholly impermissible development of a theme on which Government counsel had reached the outer limits of proper argument in his opening, thus:

"Now this case had to be chopped off somewhere. In other words, it could have gone on and on, and the ramifications and expanse of it could have been unlimited. It was limited down to fuel oil Number 1, and it was limited down to fuel oil Num-ber 1 for this reason.

"You don't know anything—at least we had to presume that you didn't know anything about the pe-troleum industry. You knew noth-ing about this case. That there was a limited time within which a por-trayal of what happened, as re-vealed by the investigation, could be shown to you. Therefore, we had to simplify the case as much as possi-ble. Also understanding that during the time that the case would be explained to you, as revealed by the investigation, that there would be from time to time an objection here and there, some confusion inserted into the Government's case from time to time; and I think that that has occurred, and that would be another reason for simplifying the case as much as possible."

Reverting now to the closing argu-ment, we quote another excerpt:

"I hoped that they would get to cross examining Evelyn Smith, be-cause she would have lowered the

boom on them. But they didn't do that. They told you she was the bookkeeper. She knew all about this. She did that. But you notice they didn't ask her too much about it."

The Government had to rely on the evidence which it introduced, and could not properly ask the jury to assume that there was more damaging evidence against the defendants which would have been brought to light if defendants' counsel had cross-examined Evelyn Smith more extensively.

"Now one of two things is happening right here in the Courtroom. Either Wagner's ship has come in or the conspiracy is being carried to a logical conclusion. This is unfolding right here before you in the Courtroom. There are two out-of-town, vigorous attorneys who are carrying the ball in this case. They sit on Wagner's side.

"There are two local gentlemen that have more or less sat back. They sit on Mr. Peek's side.

"Now either Mr. Peek has really hit the skids financially and can't go out and get lawyers that can really carry the ball or else he has not hit the skids financially and he just hired them all, and they sit some on one side and some on the other.

"I think, considering everything that has transpired here, that this is just a logical conclusion, relative to the conspiracy. They are still in the thing together. If one of them goes, they are both going to go.

"And I don't think that Mr. Wagner's ship had to come in, because I don't think they are going to let him go, because if he goes, Peek is probably going to go along with him.

"At least Wagner didn't testify that his ship had come in. As a mat-

ter of fact, he testified that he hadn't paid these bills yet but sure intended to."

This was a wholly impermissible argument not based on the evidence and one that reflected on the sincerity of counsel for both defendants.

We quite agree that "counsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial." United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 238–239, 60 S.Ct. 811, 851, 84 L.Ed. 1129. That text continues, however:

"Of course appellate courts 'in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.' See United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555." 310 U.S. at page 239, 60 S.Ct. at page 851.

There is an excellent and full discussion of the subject in the majority and dissenting opinions of the D.C. Circuit in Stewart v. United States, 1957, 101 U.S. App.D.C. 51, 247 F.2d 42, and Judge Cameron has ably dealt with the subject for our Circuit in Ginsberg v. United States, 1958, 257 F.2d 950. Further elaboration in this opinion is, we think, superfluous.

A mere reading of the improper argument demonstrates that it is so extreme and so plainly erroneous as to seriously affect the fairness of the trial and the substantial rights of the defendants. See Rule 52(b), Federal Rules of Criminal Procedure, 18 U.S.C.A. The judgment is therefore reversed and the cause remanded for a new trial.

Reversed and remanded.