366 So.2d 745 (1978)
Michael SALVATORE, Appellant,
v.
The STATE of Florida, Appellee.
No. 48513.
Supreme Court of Florida.
September 7, 1978.
Rehearing Denied February 14, 1979.
*746 Phillip A. Hubbart, Public Defender, and Paul Morris, Asst. Public Defender, Miami, for appellant.
Robert L. Shevin, Atty. Gen., George R. Georgieff, Asst. Atty. Gen., and Richard L. Wilson, Sp. Asst. Atty. Gen., Tallahassee, for appellee.
ADKINS, Justice.
This is a direct appeal from a judgment adjudging defendant guilty of murder in the first degree and a sentence of death, and also adjudging him guilty of conspiracy to commit murder for which he received a concurrent fifteen-year sentence.
The victim DeWitt, a person of financial means, engaged in various business transactions with Shapiro, which were conducted through an office rented by the victim and Epstein. Shapiro relied upon the victim to finance not only his various ideas or projects, but also personal living expenses. Unfortunately, the ideas and projects proved to be unsuccessful and the victim soon became disenchanted with the relationship. When the business relationship faltered, Shapiro considered the elimination of DeWitt.
The defendant Salvatore and Murren worked at a marina and became acquainted with the victim and Shapiro because of the latter's interest in boats.
In late December Murren and the defendant delivered a stolen boat for the victim to Epstein's house, located on a canal with dock facilities. The serial numbers were removed from the sail and the boat was secured at the victim's request.
Shapiro, Murren and defendant formulated the plan for the murder. The victim was to be brought to a car driven by Murren and the defendant in which there would be some marine radios which the victim could use for this newly acquired boat. While the victim was looking at the radios Murren was to strike him over the head with a metal pipe, push him into the trunk of the car, take him to a waiting motorboat, weight him with a cement block, take him to the Gulfstream, and dump him overboard. The sailboat would then be sold to a third party after changing the identification, and the victim's car would be left at the Epstein's house. It would then appear the victim had drowned while operating his sailboat.
The plan was going very well until the victim looked into the trunk of the car and Murren failed to hit him with the lead pipe. When Murren did not perform his duty, a suggestion was made that they proceed to the office of the victim adjacent to the parking lot. As they left the automobile the defendant picked up the lead pipe and placed it in his jacket.
When they reached the office the victim and Murren discussed boat insurance and as they were looking at an art object on the wall, the defendant hit the victim on the head with the pipe. The defendant hit him again and, as the victim pleaded for help, the defendant threw the pipe to Murren and told him to hit the victim. Murren struck him twice on the neck and side. Defendant hit the victim a few more times on the head and the victim fell, asking for help. Defendant then struck him once more across the face. Blood splattered on the wall and over the carpet. Murren and defendant placed the victim's body on the floor of a closet, shut the door and Murren left, seeking to purchase a box for the body.
The search for a box was unsuccessful, so, at the suggestion of defendant, Murren purchased rug cleaning material, plastic and indoor-outdoor carpeting. After attempting to clean the rug in the office, defendant and Shapiro cut out the blooded area of the rug with a knife. The body of the victim was rolled into the plastic and the indoor-outdoor carpeting, then brought out of the office and placed in the trunk of Murren's *747 car. The defendant drove Murren's car and Murren drove DeWitt's car to Murren's house, where they placed cement blocks in the trunk and hitched a speedboat to the car. Defendant and Murren then drove to a boating area, disposing of the cleaning utensils along the way. They placed the body in the speedboat and went out to sea. They tied cement blocks on the body and threw it into the water near the Gulfstream.
When they returned to shore Murren drove DeWitt's car to the Epstein's residence. Defendant followed in Murren's car. Murren then boarded the sailboat at Epstein's and delivered it to the third party for sale. Defendant picked Murren up after the sale and subsequently split the proceeds.
The day after the homicide, defendant and Murren met Shapiro at the office. The three of them then purchased similar carpeting and spray cement so that they could repair the damage to the office.
When the victim did not return home, his wife notified the authorities and, after several days, F.B.I. Agent Flynn entered the investigation. He discovered that Murren was wanted on a fugitive warrant from Colorado and took him into custody. Murren then told of the murder of the victim DeWitt and this prosecution resulted. There is ample evidence on which the jury could have based its verdict of guilt.
At the sentencing hearing defendant's attorney announced that the defendant had instructed him to make no statement and present no evidence and not to object during the prosecutor's statement to the jury on the penalty phase. The attorney announced that the decision of the defendant was against the advice of his attorney. Upon inquiry of the defendant, the court determined that he had consulted his attorney and the statement represented defendant's views. The defendant stated that he understood and did not want to present anything to the jury during the sentencing phase. An advisory opinion was rendered by the jury by which a majority of the jurors recommended that the court impose the death penalty.
The court ordered a presentence investigation for "further information regarding mitigating circumstances only." The court then made its findings which included the following:
"The court, having heard all the argument of the state, and neither evidence nor argument from the defense during the penalty phase of the trial, ordered a pre-sentence investigation directed solely towards determining whether mitigating factors existed under the law and the facts of this case. The court had determined in its own mind prior to the ordering of the pre-sentence investigation that aggravating factors existed in this case and accordingly, I searched the pre-sentence investigation report and also various letters submitted by friends of the defendant which I have made a part of the court file in this case, solely to determine whether such mitigating factors were present.
"After having examined all of the evidence in the trial, the recommendation of the jury, pre-sentence investigation report, and letters submitted by friends of the defendant, the court finds that it is in agreement with the advisory sentence rendered by the jury and does hereby impose the death penalty upon the defendant, MICHAEL SALVATORE.
"The court makes the following findings of fact in doing so:
"1. The murder committed in this case was especially heinous, atrocious and cruel. There is no question but that any civilized person  whether in favor of or against the death penalty  would cry out with indignation if this Court were to sentence this or any other defendant to die in the manner that the evidence shows BURT DeWITT died. The victim in this case did not meet a swift, relatively painless death. Instead, he was bludgeoned to death, with utter indifference to his obvious suffering and cries for help. Very clearly, this killing fits the definitions of `heinous,' `atrocious' and `cruel' given *748 by the Supreme Court of this state in State vs. Dixon, 283 So.2d page 1. The court finds that even were there no other aggravating circumstances in this case, this circumstance alone would be sufficient to outweigh the one possible mitigating factor the Court finds in the existing case.
"2. The Court finds, however, that there is an additional aggravating factor in that this crime was committed for pecuniary gain. The defendant was to gain directly from the proceeds of the sale of the boat, which he admitted he had previously stolen on behalf of the victim, and which he then stole again from the victim for the purposes of sharing in the proceeds of the sale, as well as for purposes of concealing the homicide that he had committed. The defendant also hoped to gain a pecuniary advantage indirectly in that he had been promised by the co-defendant future financial rewards for the commission of this crime.
"3. The only mitigating factor the Court can find after extensive search of the record and the supporting documents is that the defendant has no `significant' history of prior criminal activity. The record shows a prior conviction for a burglary for which the defendant received probation, and the defendant admitted during the course of testimony that he had actually committed the theft of the boat which figured in the commission of the instant crime. The Court is of the opinion that under the circumstances of this case, even if the defendant had no history whatever of prior criminal activity, the aggravating factors in this case would outweigh that mitigating factor. As it is, all the Court finds is that the defendant's history of prior activity is not significant.
"4. As for the other mitigating factors contemplated by law, the Court makes the following findings:
"At the time of this homicide, the defendant was not under the influence of extreme mental or emotional disturbance. The Court finds it significant that although a psychiatrist gave evidence on behalf of the defendant in an effort to mitigate the offense, he did not provide such testimony. There is no indication that the victim was a participant in the defendant's conduct, or consented to this homicide. The defendant's participation in this offense was certainly not minor. Indeed, he was the most active participant.
"He did not act under duress or the substantial domination of any other person, but, to the contrary he volunteered to commit this homicide as a favor, although subsequently he derived financial benefit from it. There is no indication that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Indeed, the evidence is to the contrary. He went to great lengths to conceal the crime that he had committed. He planned it in great detail and discussed several alternatives before it occurred. He fabricated false testimony and sought to procure false testimony from at least one other person besides Larry Murren in an effort to conceal this crime. The Court finds it ironic that the defendant would have the Court believe that he would lie to save himself from a five-year felony, but would be truthful when the stakes were considerably higher as in a capital offense. And, last, the Court does not find that the age of the defendant at the time of the crime, approximately thirty-one years of age, is in any way a mitigating factor in this case.
"5. Notwithstanding the absence of any significant mitigating factors in this case, the Court considered the pre-sentence investigation report and letters from the defendant's minister, psychiatrist, and friends in an effort to see if there were anything else in the record to justify mitigation of the sentence. The Court will not go into detail *749 as to each of the letters of comments from each of these people but, generally speaking, the substance of their comments, all of which are made a part of this record, and all of which are in the court file, can be broken down into the following categories:
"a. The witness believes the defendant to be innocent. Under no circumstances would the Court consider this as a mitigating factor. A jury has determined, on the basis of competent evidence, to the contrary. I am in no way disposed to take issue with their verdict as to guilt or innocence.
"b. The defendant has a wife and daughter, who are good people, and will suffer needlessly if he is condemned to die. Virtually every defendant in virtually every criminal case has some loved ones  mothers, wives, brothers and sisters, daughters, who will suffer. It would be unconscionable for the court to show mercy to those who have wives and families while condemning to death defendants who committed the identical acts and weren't so blessed.
"c. The defendant is a religious person and a `good' man. The defendant's actions and conduct before, during, and after the offense and at the trial, contradict this hypothesis. The Court has observed the defendant on many occasions now. Never has the Court observed the slightest indication of remorse or regret for anything, other than having been caught.
"d. The defendant has been a good neighbor and the witness would trust his children with the defendant. The Court does not in any way find this a mitigating factor.
"6. Reference was made in the pre-sentence investigation and at the time of the penalty phase of the trial to the fact that the defendant did not want the Court to consider any mitigating factors and that he felt the death penalty would be advantageous to him on appeal. The Court wants to make clear that in no way did this desire of the defendant's in any way enter into the decision which the Court has arrived at. In sharp contrast to what the evidence shows were the actions of the defendant, the Court has agonized over this decision but feels that its personal desires must yield to what its interpretation of the law dictates."
During the cross-examination of defense witness Enrique Dobarganes, the State was allowed to make inquiry concerning a statement of Murren that he had received a sentence of ten years for his part in the killing. Also, on rebuttal the State was allowed to prove by Judge Cowart that Murren had entered a plea of guilty to second degree murder and received a sentence of ten years for his involvement in this homicide.
The defendant moved for a mistrial during the cross-examination of Dobarganes and insisted that it was reversible error to allow Judge Cowart to testify as to the plea entered in the case. Defendant says that the testimony regarding the sentence brought out on cross-examination of Dobarganes was beyond the scope of direct examination, and the rebuttal testimony regarding Murren's guilt and sentence was improper since no prior testimony was thereby rebutted.
As a general rule, it is improper for the State to disclose during trial that another defendant had been convicted. Thomas v. State, 202 So.2d 883 (Fla.3d DCA 1967). The case sub judice presents an exception to this rule.
During the examination of Dobarganes by defense counsel, the following occurred:
"Q. All right; what did you say to him? What did you say to Larry Murren and what did Larry Murren say to you, sir?
"A. I asked him what was he jailed for. He said murder.
And I asked him if he had really killed the guy. That's when he said that he didn't kill the guy and that *750 the guy was not dead and that the guy was out of Florida. And that was about all."
The body of the victim was never recovered and this testimony interjected the question of whether the victim was, in fact, alive. The fact that Murren entered a plea of guilty of second degree murder on the homicide of the victim was relevant to show a statement by Murren inconsistent with the statement testified to by Dobarganes. Through cross-examination defense counsel made an excellent attack on Murren's credibility showing that he had lied previously under oath, had fled Colorado as a fugitive from felony charges, had carried a concealed weapon and was an adulterer. The plea of Murren in the murder case was appropriate evidence to bolster the credibility of his testimony that the victim was dead.
In any event, Florida case law clearly states that a motion for a declaration of a mistrial is addressed to the sound discretion of the trial judge. Strawn v. State ex rel. Anderberg, 332 So.2d 601 (Fla. 1976); Paramore v. State, 229 So.2d 855 (Fla. 1969); modified on other grounds, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972); Tate v. Gray, 292 So.2d 618 (Fla.2d DCA 1974); Warren v. State, 221 So.2d 423 (Fla.2d DCA 1969); Prokos v. State, 209 So.2d 484 (Fla.3d DCA 1968); Baisden v. State, 203 So.2d 194 (Fla.4th DCA 1967); Garcia v. State, 142 So.2d 318 (Fla.2d DCA 1962). In this State the rule has been long established and continuously adhered to that the power to declare a mistrial and discharge the jury should be exercised with great care and caution and should be done only in cases of absolute necessity. State ex rel. Wilson v. Lewis, 55 So.2d 118 (Fla. 1951); State ex rel. Alcala v. Grayson, 156 Fla. 435, 23 So.2d 484 (1945); King v. State, 258 So.2d 21 (Fla.2d DCA 1972); Warren, supra; Kelly v. State, 202 So.2d 901 (Fla.2d DCA 1967).
There was no absolute necessity to declare a mistrial and, under the circumstances of the case, the evidence was admissible.
By motion to dismiss defendant alleged that Murren had given a statement under oath to detective Mallette, which statement was recorded and maintained by the police officer; that defendant had demanded the right to listen to or copy the recording, but the recording was "lost." In support of the motion defendant relied upon Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and Johnson v. State, 249 So.2d 470 (Fla.3d DCA 1971); as well as Farrell v. State, 317 So.2d 142 (Fla.1st DCA 1975).
In Farrell v. State, supra, the court held that the State's unintentional destruction of a tape recording of a drug transaction, of which defendants were charged, after timely demand for discovery, violated defendants' right to due process. In a specially concurring opinion Chief Judge Boyer said:
"I concur, but in doing so I feel it desirable to point out that we reverse in this case based upon the uncontradicted facts as recited by the stipulation of the parties, particularly the allegation by the appellant that the erased tapes would have been beneficial to him and that destruction thereof resulted in prejudice. (See Treverrow v. State, Sup.Ct.Fla. 1967, 194 So.2d 250 and Estes v. State, Fla.App. 1st, 1974, 294 So.2d 122.) In other words, the mere fact that a tape recording which might have been used in evidence was inadvertently destroyed does not ipso facto lead to reversal. On the contrary, it must be demonstrated that the destroyed evidence was material and that the defendant was prejudiced by the destruction." At 144.
The United States Supreme Court in Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), clarified the Brady decision when it said:
"The heart of the holding in Brady is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's *751 favorable character for the defense, and (c) the materiality of the evidence." At 794-95, 92 S.Ct. at 2568.
An Annotation, "Withholding or Suppression of Evidence by Prosecution in Criminal Case as Vitiating Conviction," in 34 A.L.R.3d at 16, contains the following:
"While virtually all of the cases in this annotation recognize the `harmless error' rule  that in order to vitiate a conviction the error must have been prejudicial to the defendant  a few cases have suggested the use of a variable standard in determining how much of a showing of prejudice the defendant must make before his conviction will be overturned for suppression of evidence. Under such a variable standard, more deliberate or flagrant conduct by the prosecutor in suppressing evidence requires less of a showing of prejudice to the defendant, while more excusable conduct on the part of the prosecutor  such as mere negligence  calls for a showing of greater prejudice to the defendant before relief will be granted.
"The standard of prejudice to be met in order to obtain a new trial varies inversely with the degree to which the conduct of the trial has violated fundamental notions of fairness... ." At 68.
In the case sub judice the "suppression" was not deliberate. Detective Mallette appeared at the office of defense counsel for the purpose of a deposition. At that time the detective stated that he had the tape with him and proffered it for the use of defense counsel. They did not want to hear the tape at that time. When called as a witness in the case, the detective testified that he made a tape recording of a statement by Murren but that he didn't know where the tape recording was. On cross-examination the detective stated that the tape recording had been in the case file. There was no further examination or inquiry concerning the contents of the tape. To show prejudice, defense counsel in his motion states that the taped statements directly contradict the testimony of Murren and that the tape recording was "lost."
The standard of prejudice which must be met by defendant in order to obtain a new trial varies inversely with the degree to which the conduct of the trial has violated fundamental notions of fairness. See Kyle v. United States, 297 F.2d 507 (2d Cir.1961), cert. den. 377 U.S. 909, 84 S.Ct. 1170, 12 L.Ed.2d 179.
In the case sub judice there was negligence on the part of the prosecution, but no misstatements to the court. At one time defense counsel had access to the tape. On cross-examination when asked "you have lied under oath," the witness Murren answered "yes." No judgment should be reversed unless we are of the opinion that error was committed which injuriously affected the substantial rights of the defendant. It should not be presumed that error injuriously affects the substantial rights of the defendant. Section 924.33, Florida Statutes; cf. North v. State, 65 So.2d 77 (Fla. 1963); Dobbert v. State, 328 So.2d 433 (Fla. 1976), application of harmless error to death cases. Under the circumstances of this case, we hold that the loss of the tape recording was not such a suppression of evidence by the prosecution as to vitiate the conviction or warrant a new trial.
The fact that non-practicing attorneys were excluded from jury service does not violate defendant's constitutional right to be tried by a jury of his peers. See Williams v. State, 285 So.2d 13 (Fla. 1973). Also, the attack upon the constitutionality of Section 40.01, Florida Statutes, is without merit, as this statute has been held to be constitutional. Wilson v. State, 330 So.2d 457 (Fla. 1976). The other objections to the jury panel raised by defendant are without merit.
The Florida statute inflicting capital punishment has been held constitutional. Proffitt v. State, 315 So.2d 461 (Fla. 1975), aff. 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), but defendant says that the death penalty is unconstitutionally imposed when a co-defendant on similar facts is not sentenced to death. He cites Slater v. State, 316 So.2d 539 (Fla. 1975), where we *752 held that the imposition of the death penalty against a defendant convicted of first degree murder occurring during a robbery was unconstitutionally applied where the accused had been an accomplice and the "triggerman," who entered a plea of nolo contendere, was only sentenced to life imprisonment.
The case sub judice is quite different. The defendant formulated the plan to kill the victim and was the actual perpetrator of the crime. Murren refused to hit the victim in the parking lot in accordance with the original plan. Also, Murren refused to hit the victim while he was in the office until after defendant had begun beating the victim with the pipe. The defendant, not Murren, beat the victim to death and Murren was responsible for the entire case being brought to light.
During the course of the trial the conviction of Murren of second degree murder, as well as the sentence imposed, were brought out in evidence. The jury had this information at the time the advisory verdict recommending capital punishment was rendered.
Under the unusual circumstances of this case, the infliction of capital punishment should not be reduced merely because Murren received a sentence for a term of years.
We have carefully reviewed the record in this case and it is our opinion that the aggravating and mitigating circumstances are such that the infliction of capital punishment is warranted.
Finding no error, it is our opinion that the judgments and sentences should be and they are hereby affirmed.
It is so ordered.
ENGLAND, C.J., and OVERTON, SUNDBERG and HATCHETT, JJ., concur.
BOYD, J., concurs in part and dissents in part with an opinion.
BOYD, Justice, concurring in part, dissenting in part.
The 2800 page record in this case shows that appellant, along with two other men, committed first degree murder. His relative degree of participation with the two other killers in this cause does not mandate imposition of the death penalty.[1] I would, therefore, affirm his guilt and reduce the sentence to life imprisonment without eligibility for parole during the first twenty-five years.
NOTES
[1] Slater v. State, 316 So.2d 539 (Fla. 1975).