395 So.2d 1223 (1981)
Joseph J. LIBERTUCCI, Appellant,
v.
The STATE of Florida, Appellee.
No. 79-2158.
District Court of Appeal of Florida, Third District.
March 24, 1981.
Rehearing Denied April 13, 1981.
*1224 Joel Hirschhorn, Miami, for appellant.
Jim Smith, Atty. Gen., for appellee.
Before HUBBART, C.J., and DANIEL S. PEARSON and FERGUSON, JJ.
DANIEL S. PEARSON, Judge.
Libertucci, the City Manager of the City of Miami Springs during a pertinent twenty-two month period from 1977 to 1979, was prosecuted and convicted on multiple counts of grand theft and grand larceny of City funds. The State contended that throughout the nearly two years covered by the offenses charged in the information, Libertucci ordered construction materials for the City from an outfit called General Supply Company (GSC); the City paid some $30,000 for these materials; the materials were not delivered; and Libertucci was paid off by GSC.
*1225 The evidence showed that Howard Herring,[1] owner of GSC, received and cashed checks from the City of Miami Springs for materials that were never delivered to the city; that Libertucci, in his capacity as City Manager, did, in fact, authorize the purchase of these materials; and that during the time when the alleged scheme was in operation, Libertucci deposited in his bank account more than he earned from his salary as City Manager. But evidence that Libertucci knew when he authorized payments to GSC that the materials had not been delivered or received, and evidence of any temporal or quantitative relationship between the payments made to GSC, the withdrawals of cash from GSC, and the deposits into Libertucci's account,[2] was, at best, extremely tenuous. In short, the case against Libertucci more closely resembled a proceeding to oust him from office for derelictions in administration than a prosecution for theft and larceny.
To bolster its languishing prosecution, the State called Travis, one of Herring's employees. Over Libertucci's objection, Travis was asked:
"Did Howard [Herring] ever tell you that he was worried about what Sandra [Herring's wife] knew about his connections with the City of Miami Springs and the business that he was doing with them?"
Travis' answer was, "yes."[3]
The State concedes, as it must, that Travis' testimony, as against Libertucci, is rank hearsay and comes within no recognized exception to the hearsay rule.[4] However, the State speciously argues that this hearsay was not prejudicial, because the statement makes no direct reference to Libertucci and could therefore be received by the jury simply as Herring's admission that he was involved in some wrongdoing with the City of Miami Springs. This argument is belied by the fact that in a trial of Libertucci alone, the only probative value, and thus relevancy, of this testimony is that the declaration could be taken to mean that Herring was involved in some wrongdoing with Libertucci, who in the context of this case, was the personification of the City. Thus, the very equation between the City and Libertucci, which, ab initio, makes this testimony arguably relevant, is the same equation that just as arguably makes it prejudicial.[5] Since, in the fragile circumstantial *1226 case before us,[6] the hearsay testimony was the only evidence which tended to cast Libertucci's activities in a sinister light, we conclude that the error in admitting this testimony injuriously affected substantial rights of Libertucci, see § 924.33, Fla. Stat. (1979); Salvatore v. State, 366 So.2d 745 (Fla. 1979),[7] and that therefore we must reverse for a new trial.
Reversed and remanded for a new trial.
NOTES
[1] Herring was charged as a co-defendant with Libertucci. Libertucci was granted a severance from Herring on the ground that the State was committed to introducing Herring's out-of-court declarations to others which would prejudice Libertucci. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Herring was separately tried, found guilty, and in August 1979, a month before Libertucci's trial commenced, sentenced. Herring's appeal was pending in this court during Libertucci's trial. We affirmed Herring's conviction in July 1980. See Herring v. State, 386 So.2d 1326 (Fla. 3d DCA 1980). In the absence of a grant of immunity, Herring's right to assert his Fifth Amendment privilege, if called by the State to testify in Libertucci's trial, continued throughout the pendency of his appeal. King v. State, 353 So.2d 180 (Fla. 3d DCA 1977). [The rule of King is otherwise in those jurisdictions which provide use, but not transactional, immunity. Compare In re Liddy, 506 F.2d 1293 (D.C. Cir.1974), with Frank v. United States, 347 F.2d 486 (D.C. Cir.1965). See also United States v. Kelly, 464 F.2d 709 (5th Cir.1972)]. The State did not call Herring as a witness in Libertucci's trial. See n. 5, infra.
[2] The evidence concerning Libertucci's bank deposits was admitted without objection, and the propriety of its admission is not before us. We note, however, that the lack of nexus as to time and amounts between the City's payments and Libertucci's deposits not only makes the proof tenuous, but arguably makes it inadmissible. See, e.g., Astrachan v. State, 158 Fla. 457, 28 So.2d 874 (1947); Thompson v. State, 58 Fla. 106, 50 So. 507 (1909); Harrison v. State, 104 So.2d 391 (Fla. 1st DCA 1958); Annot., 91 A.L.R.2d 1046 (1963). Libertucci's explanation as to the innocent source of these additional funds was unrebutted.
[3] Ironically, this very testimony, inter alia, was the basis of Libertucci's severance motion.
[4] There was no independent proof of a conspiracy between Herring and Libertucci, but had there been, Herring's out-of-court declaration is facially not one made in furtherance of the conspiracy and would not, therefore, be admissible. See Tresvant v. State, 396 So.2d 733 (Fla. 3d DCA 1981).
[5] The prejudice was, in our view, exacerbated by the prosecutor's comments in his closing argument to the jury, "Mr. Herring is not here. I cannot call him. If I call him I immunize him. He has already been to trial, and that is the end of it." The clear inference of these comments is that but for the inability of the prosecutor to call Herring as a witness, the prosecutor would have called him, which, in turn, suggests that Herring's testimony would lend support to the State's case. We perceive little difference between a prosecutor's statement to the effect that he could have brought forth additional witnesses, but chose not to, so clearly condemned, see Richardson v. State, 335 So.2d 835 (Fla. 4th DCA 1976); Thompson v. State, 318 So.2d 549 (Fla. 4th DCA 1975); United States v. Humer, 542 F.2d 254 (5th Cir.1976); Wagner v. United States, 263 F.2d 877 (5th Cir.1959); Ginsberg v. United States, 257 F.2d 950 (5th Cir.1958); Annot., 90 A.L.R.3d 646 (1979), and a prosecutor's statement, as here, that he would have brought forth an additional witness, but was prevented from doing so. Additionally, albeit indirectly, the prosecutor's comments violated the rule against disclosing that a co-defendant was previously convicted, see Salvatore v. State, 366 So.2d 745 (Fla. 1979); Thomas v. State, 202 So.2d 883 (Fla. 3d DCA 1967); see also Moore v. State, 186 So.2d 56 (Fla. 3d DCA 1966), which rule has the prophylactic effect of insuring that the jury will not infer from the guilt of the co-defendant the guilt of the defendant on trial.
[6] The weaker the case, the greater the danger that the inadmissible evidence unfairly tipped the scales against the defendant. See Richardson v. State, supra.
[7] We perceive no meaningful difference between the "injuriously affects substantial rights" standard for determining harm found in Section 924.33, Florida Statutes (1979) (applicable to the review of criminal cases only) and the "results in a miscarriage of justice" standard found in Section 59.041, Florida Statutes (1979) (applicable to the review of both civil and criminal cases), assuming that Section 59.041 has any continued viability in a criminal appeal.