COHEN, J.
 

 In a consolidated appeal, Joseph Scott Freeman challenges his conviction and sentence for aggravated stalking, kidnapping with a weapon, violation of an injunction against domestic violence, and violation of probation. We affirm.
 

 This case is a textbook example of the futility and potential danger in attempting to negotiate with or mollify a controlling, abusive partner. Karen Kummerer was Freeman’s ex-girlfriend in a relationship that lasted approximately eight months. For four of these months Freeman and Kummerer lived together in her home. When the relationship soured, Freeman moved out but continued to visit and frequently call-on one day alone he left 27 voice mail messages. Hoping to stop the phone calls, Kummerer agreed to see Freeman the following day but then avoided his attempts to contact her. The next day, approximately two weeks before the events underlying the charges in this case, Freeman jumped into Kummerer’s car when she was stopped at a stop sign on her way to work. Angry at her deception, he threatened Kummerer, who once again attempted to placate Fi’eeman by agreeing to see him that evening. She then drove him to his Jeep and he got out. Upon arriving at work, she reported the matter to co-workers and the police.
 

 Hoping to stop the threats and harassment, Kummerer obtained a temporary injunction for protection against domestic violence. She also changed the code to her car’s remote keyless entry because Freeman had one of the keyless entry remotes; this enabled him to unlock the car’s doors at the stop sign. However, she inadvertently forgot to change the code to the trunk.
 

 The following week included a preplanned business trip out of state. Upon return, Kummerer was met and accosted by Freeman in the Orlando International Airport’s parking garage. Freeman grabbed her and insisted she accompany him back to his parents’ house in Daytona
 
 *375
 
 Beach, stopping on the way in an unsuccessful attempt to obtain a cash advance on Kummerer’s credit card. After giving her sleeping pills, Kummerer awoke to find herself in the back seat of Freeman’s Jeep, in Ocala, wearing different clothing. When Kummerer attempted to get the attention of passersby, Freeman threatened to take her into the Ocala National Forest and kill her. At some point in time, Kum-merer spoke with Freeman’s family and agreed not to report the matter to the police after they agreed to put him into rehabilitation for substance abuse. Freeman then drove her back to the Orlando airport where she picked up her car and returned to her home in Daytona Beach.
 

 Upon returning home, Kummerer related the events to her sister who urged her to go to the police, but she declined, afraid of the repercussions. However, they agreed that if anything out of the ordinary occurred to her, her sister should contact the police. On November 21, after a hearing Freeman attended, a judge issued a permanent injunction against domestic violence that prohibited Freeman from directly or indirectly contacting Kummerer.
 

 After spending the Thanksgiving holiday •with family out of state, Kummerer drove to work the following Monday. Noticing the “trunk ajar” light was on, she pulled over to secure it. As she reached the rear of the car, Freeman jumped out of the trunk, brandishing a knife. Threatening to cut her if she screamed again, he put her into the car, drove to his Jeep, and attempted to tie her hands behind her back. What occurred next was a seven-day odyssey through six states.
 

 During the course of these seven days, Freeman smoked crack cocaine and used steroids. He forced Kummerer to withdraw money from her bank account and call family members to report she was fine and request they write checks to Freeman’s mother.
 
 [1]
 
 They only stayed in motels that did not require identification, and he paid in cash. Freeman also replaced the Jeep’s Florida license plate with a series of stolen plates. On four occasions, Kummerer was able to leave notes in restrooms reporting her abduction and urging the finder to notify the Daytona Beach Police Department.
 

 One of several phone calls Freeman forced Kummerer to make was to her niece, Brenna Randall, with whom she lived. Suspecting something was wrong, Randall asked Kummerer to repeat a phrase if she wanted the police to be called. She repeated the phrase, and Randall notified law enforcement of her aunt’s kidnapping. The police located Kummerer’s car near Freeman’s parents’ home and began a search, aided by the notes recovered along the route. An arrest warrant was issued, and alerts were put on both Freeman’s and Kummerer’s bank accounts. Additionally, phone calls to Freeman’s parents were monitored. The FBI was able to trace ATM withdrawals and learned Freeman had a former cellmate who lived in the Sevierville, Tennessee area. Ultimately, the FBI traced the two to Greenville, Mississippi, where, after a short pursuit, Freeman was apprehended.
 

 When removed from the Jeep, Kummerer was hysterical and would not let go of the officer. A subsequent search of the Jeep revealed a knife, a Ford key and keyless entry remote, a Florida license plate, a rope, plastic ties, and a partially-consumed bottle of vodka. Additionally, a box containing syringes and vials of steroids was found. Freeman’s defense at trial was that Kummerer voluntarily accom
 
 *376
 
 panied him on an impromptu vacation. Various witnesses from the six-state trek testified. The State’s witnesses were called to establish Kummerer’s emotional state and Freeman’s constant proximity to her. His witnesses testified about Kum-merer’s opportunities to free herself or that nothing unusual or out of the ordinary appeared to be happening. The jury found Freeman guilty, as charged.
 

 Freeman raises two issues on appeal: first, whether the trial court erred in allowing the State to introduce evidence of his steroid use, and second, whether the trial court erroneously denied his motion for mistrial following testimony implying that he had a prior criminal record.
 

 Freeman contends the evidence of his steroid use only served to place him in a “bad light” due to the negative connotations associated with its use. However, the testimony indicated that Freeman was lawfully using steroids, as he had been a personal trainer, and that Kummerer even paid for some of them during their relationship. Although of minimal, if any, relevance, Freeman’s steroid use added factual context to the week’s events. Moreover, the evidence cannot be characterized as evidence of a collateral crime or prior bad act because his steroid use was legal. In stark contrast, Freeman did not object to the, arguably, more prejudicial evidence of his unlawful purchase and use of crack cocaine during the course of the week. Instead, he used this evidence to support his defense that he and Kummerer had a continuing relationship, notwithstanding the injunction, and she voluntarily accompanied him on what turned out to be a one-week drug and alcohol binge.
 
 [2]
 
 Freeman’s failure to object is notable because evidence of a victim’s or witness’ past drug use is generally inadmissible unless used for impeachment.
 
 See Edwards v. State,
 
 548 So.2d 656, 658 (Fla.1989). In this context, the admission of Freeman’s steroid use was not harmful error.
 

 The admission of testimony referring to Freeman’s former cellmate is more troubling. The FBI contacted Freeman’s friends, relatives, and acquaintances in the Southeast as part of the ongoing effort to locate the two. During this line of inquiry, of limited evidentiary value, the agent testified that they received information that one of Freeman’s cellmates might be located in the Sevierville, Tennessee area. Freeman’s counsel objected and moved for a mistrial which was denied. The trial court’s offer to give a curative instruction was declined.
 

 Freeman argues that admitting the testimony that he had a cellmate was an impermissible and prejudicial attack on his character that denied him a fair and impartial trial. The character of an accused may not be attacked by the State unless first put into issue at trial by the accused.
 
 Bates v. State,
 
 422 So.2d 1033, 1034 (Fla. 3d DCA 1982). The testimony is somewhat ambiguous in that it does not specify when, and under what circumstances, Freeman found himself incarcerated.
 
 See Evans v. State,
 
 422 So.2d 60, 60-61 (Fla. 3d DCA 1982) (reference to a mug shot in police files does not necessarily convey to a jury that a defendant has committed crimes or has previously been in trouble with the law);
 
 but see D’Anna v. State,
 
 453 So.2d 151, 152 (Fla. 1st DCA 1984) (the mere mention of mug shots constitutes error). In this case, the mention of a cellmate occurred in the context of Freeman seeking out that individual,
 
 *377
 
 which presupposed more than a fleeting encounter. It contemplated someone Freeman knew well enough to know of his location post-incarceration, and from whom he might seek assistance. A reasonable juror could only surmise that Freeman had a prior criminal history that led to his incarceration. The admission of such testimony was error. However, the question is whether the error was so harmful that it infected Freeman’s fundamental right to a fair trial, thereby mandating reversal.
 
 Goodwin v. State,
 
 751 So.2d 537, 547 (Fla. 1999).
 

 The law is well settled that mistrials should be granted with great care and caution and only in cases of absolute necessity.
 
 Salvatore v. State,
 
 366 So.2d 745, 750 (Fla.1978). The decision to grant or deny a mistrial is addressed to the sound discretion of the trial judge. We have reviewed the entire record and conclude the error was harmless. While some of Kummerer’s actions could be perceived consistently with voluntary presence, the overwhelming weight of the evidence was to the contrary, and the jury so found. That said, we expect law enforcement to possess the training to understand that evidence of this nature is inadmissible. We further expect assistant state attorneys to prepare witnesses in advance to avoid interjecting such evidence into a case. The fact that we have deemed the admission of the cellmate’s testimony harmless error in no way condones either the lack of preparation or lack of professionalism. It was gratuitous and completely unnecessary.
 

 AFFIRMED.
 

 GRIFFIN and MONACO, JJ., concur.
 

 [1]
 

 . Freeman’s mother ostensibly would then place money into his account.
 

 [2]
 

 . In allowing him to develop this defense, the trial judge erroneously allowed the admission of Kummerer’s past use of powder cocaine.
 
 See Richardson v. State,
 
 561 So.2d 18 (Fla. 5th DCA 1990).